

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00315-CV

———————————————

STORMIE CALLAWAY, TRUSTEE OF THE EDGAR PAGETT CALLAWAY
REVOCABLE LIVING TRUST, AND STORMIE CALLAWAY, EXECUTOR OF
THE ESTATE OF EDGAR "PAT" PAGETT CALLAWAY, Appellant and
Appellee

V.

ELISE H. PIGG, BY AND THROUGH A. ROBIN PIGG, AS ATTORNEY IN
FACT, Appellee and Appellant

―――――――――――――――――――――――――――――――――――――

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-329616-21

―――――――――――――――――――――――――――――――――――――

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

Appellant Stormie Callaway, as trustee of the Edgar Pagett[1] Callaway Revocable Living Trust and as executor of the Estate of Edgar "Pat" Pagett Callaway (collectively, Callaway), in seven issues challenges a judgment rendered after a jury trial granting relief to Appellee Elise H. Pigg, by and through A. Robin Pigg, as attorney in fact (Pigg). The controversy below involved Pigg's challenge to the use of Anemone Lane (the Lane), which Pigg claimed was her private driveway and which Callaway claimed she had the right to use either because the Lane had been dedicated to public use or because she held rights under an easement agreement that inured to her benefit.

The trial court signed an amended final judgment that decreed a number of declarations implementing the jury's verdict and a summary-judgment ruling. The judgment also reflected the trial court's own determination of Pigg's claim for attorney's fees. In essence, that judgment decreed that the Lane had not been dedicated to public use and was not burdened by an implied easement. With respect to the easement agreement, the trial court decreed that the agreement had not terminated because of failure of performance by Callaway's predecessors in interest

---

[1]Callaway's brief and the deed use the spelling "Padgett," but the judgment and other documents use the spelling "Pagett." We use the spelling found in the judgment.

but that Callaway had no rights in the agreement because she was not a successor to it and that Pigg was excused from further performance of the agreement.

We dispose of Callaway's issues as follows:

- Callaway's first issue is a legal- and factual-sufficiency challenge to the jury's answer that the Lane was not dedicated to public use. In essence, the jury resolved conflicting expert opinions on what a plat revealed about the intent to dedicate the Lane. It was within the jury's purview to resolve that question, and it is not within our purview to second-guess the jury's determination. We overrule Callaway's first issue.

- Callaway's second and third issues challenge the trial court's implied conclusion that the easement agreement was ambiguous as to when it became effective and the jury's answer resolving the ambiguity—these were the bases for a declaration that Callaway was not a successor to the agreement. We conclude that the trial court erred as a matter of law in its declaration because a deed to a predecessor in interest of Callaway passed an interest in the agreement to that predecessor. We sustain Callaway's second and third issues.

- Callaway's fourth issue is a legal- and factual-sufficiency challenge to the jury's answer that she had failed to comply with the easement agreement. Callaway's challenge appears to turn on the contention that the evidence was undisputed that she had tendered performance under the terms of the agreement. The evidence on that question was not undisputed, and Callaway fails to challenge another basis that the jury had to answer the question as it did. We overrule Callaway's fourth issue.

- Callaway's fifth issue is a factual-sufficiency challenge to the jury's negative response to questions regarding whether Pigg waived her claim that Callaway failed to comply with the easement agreement or was estopped to claim that the agreement was breached by nonpayment under its terms. In both instances, the jury's answers are not contrary to the great weight and preponderance of the evidence. We overrule Callaway's fifth issue.

- Callaway's sixth issue raises abuse of discretion and evidentiary challenges to the trial court's award of Pigg's attorney's fees through trial

3

and the question of whether the fee claim was properly segregated. We overrule Callaway's sufficiency challenges. Because, however, we sustain Callaway's challenge to one of the trial court's declarations, we remand the question of fee segregation to the trial court to exercise its discretion to decide whether the fee award should be recalculated.

- Callaway's seventh issue asserts that the Estate of Edgar "Pat" Pagett Callaway had no interest in the property at issue and that the Estate should not have been a party against which relief was granted. Callaway's argument ignores that she sought relief as the executor of the estate. It also fails because the deed that Callaway claims conveys the property at issue to a Callaway trust references a different property than the one at issue. We overrule Callaway's seventh issue.

We affirm the trial court's judgment other than the remand on the question of attorney's fees.

Pigg also filed her own appeal raising issues that were contingent upon our disposition of Callaway's appeal. Because we affirm the judgment's dispositive declarations, we do not reach the issues raised by Pigg. *See* Tex. R. App. P. 47.1.

## II. Factual and procedural background

### A. Factual Background

#### 1. We set forth the lay of the land.

At issue is who can use the Lane. Pigg contends that the Lane is her private driveway, and Callaway contends that she also has the right to use the Lane.[2]

To give the reader perspective, we include text and a Google Earth photograph from Pigg's brief to help the reader visualize the features on the ground:

[2]Pigg's husband also executed the easement agreement and was involved in the dealings with the properties recounted at trial. However, he was deceased by the time of trial. Thus, we refer to Ms. Pigg in the singular.

4

This Google Earth map shows the respective locations of [the] Lane, Pigg's home, the home of her daughter Robin Pigg, Callaway's Future Lot 32, and the two nearby public roads to the north of Callaway's property (Reed) and to the west of Pigg's land (Briar):



Other than Robin Pigg's home (on the left of the image) and the home owned by long-time family friends the Rossens (just south of [the] Lane in the middle of the image), Pigg owns all the lands from just north of [the] Lane and extending southward, and only the Rossens and family live off [the] Lane.

### 2. We set forth the controversy over whether the Lane was dedicated to public use.

Most of the property represented in the photo was once owned by the Johnsons, and they made plans to develop part of the property into a residential development. Whether the Lane was dedicated to public use centered on a plat that the Johnsons filed in 1973 (the 1973 Plat).

5

The 1973 Plat depicted both a future Lot 32 (that Callaway eventually came to own) and the Lane but did so in ways that the parties—particularly Pigg—argued left open the question of what the Johnsons had intended to accomplish with the 1973 Plat. As we will detail in due course, the clash over whether the 1973 Plat accomplished a public dedication was a battle of experts between two surveyors who testified on behalf of Pigg and Callaway, respectively, on whether the 1973 Plat revealed an intent to dedicate the Lane. Not unexpectedly, the experts offered disparate views on this question.

The parties agree that the 1973 Plat was accepted by the Tarrant County Commissioners Court. But the parties agree on little else with respect to whether use of the Lane after the filing of the 1973 Plat reveals a dedication to the public. Callaway highlights that the Lane has been used for deliveries, trash collection, and school buses and has been used by people other than Pigg. Pigg highlights that the Lane has not been maintained by the county and that uses of the Lane have been authorized by her or have served her needs or that she was honoring authorized specific uses given by her predecessors in interest.

The jury in this case eventually found that "the 1973 Plat [did not] dedicate [the] Lane to the public use." In turn, the trial court declared that "the 1973 Plat . . .

did not create any public rights in any part of [Pigg's] land[,] and thus[ Callaway[3]] may not use [Pigg's] land to access Briar Road by virtue of the 1973 Plat."

### 3. We set forth the controversy over whether Callaway had the right to use the Lane under an easement agreement.

Taking the issue of dedication off the table, the case turned to the fraught question of whether an easement agreement gave Callaway the right to use the Lane. The history of Lot 32 that Callaway owned and the creation and enforcement of the easement agreement at issue are intimately associated.

In the 1970s, a party bought two of the tracts that are vaguely represented in the 1973 Plat—Lot 33 and the pivotal Lot 32. Pigg testified that at this point in time, the owners of the lots had access to a public road adjoining Lot 33 without the use of the Lane. In the 1980s, the Johnsons sold the remaining land that they owned to Pigg and her daughter Robin.

The situation became more complicated in 1986 when the owners of Lots 32 and 33 conveyed Lot 32 to a party who began construction of a house on the lot. Pigg testified that the party holding title to Lot 32 had no easement to use the Lane but began using the Lane; Pigg wrote the then-owner of Lot 32 stating that to the best of Pigg's knowledge, the owner did not have an easement down the Lane to Lot 32.

---

[3]The judgment makes repeated references to "Defendants" because Callaway was sued in two capacities—as trustee and as executor. Because Callaway was the sole defendant, we use the singular term "Callaway."

7

In Pigg's view, the then-owner of Lot 32 should have been given access to a public road through the grantor's adjoining lot.

During this time, without Pigg's permission, the Lane was paved from its point of contact with a public road to the boundary of Lot 32. When Pigg protested this and had an attorney contact the bank that was financing construction of a home on Lot 32, the bank became involved to negotiate access to Lot 32. Apparently, the then-owner of Lot 32 and the bank were in conflict.

In 1988, the bank sought an easement from Pigg. In that year, Pigg executed the easement agreement (Easement Agreement) with the bank. The terms and enforcement of the Easement Agreement became the other central focus of the dispute below.

Though Pigg executed the Easement Agreement in 1988, the parties in this suit disagreed when it became effective to actually convey the easement it referenced. This controversy is central to Pigg's argument that the Easement Agreement is not in the chain of title to the parties who later owned Lot 32 and that the benefit of the Easement Agreement never passed to Callaway. The controversy focused on whether the Easement Agreement was ambiguous regarding its effective date and on how its various provisions and when it was signed by the bank resolved the ambiguity questions.

The chain-of-title argument based on the effective date of the Easement Agreement became pivotal because between the date that Pigg executed the Easement

8

Agreement and its effective date (as determined by the jury), the owner of Lot 32 (who had been building a house) conveyed Lot 32 to the bank, and then the bank conveyed the lot to a new owner—the Hoppenraths. The deed from the bank conveyed to the new owners of Lot 32 an ingress-and-egress easement described by the same property description used in the Easement Agreement and all appurtenances to the lot. Apparently, because the trial court concluded that the Easement Agreement was ambiguous, the question of when it became effective was submitted to the jury, which found that it was not intended to be effective until 1990—a date after the bank had conveyed Lot 32 to the Hoppenraths. This finding was the predicate for the trial court's declaration that Callaway in her various capacities is "not [a] successor[] to the 1990 Easement Agreement . . . , and the . . . Easement Agreement therefore grants [Callaway] no rights to use [Pigg's] land as described in the [judgment]."

But the parties also litigated the questions regarding whether the Easement Agreement ceased to be enforceable because of lapses in performance related to what it required and whether Pigg had forfeited her right to complain about those lapses. Two features of the required performance of the Easement Agreement were in controversy during the trial—its provisions requiring a payment of $100 per year to Pigg and a restriction that the easement created be used only for "pedestrian and vehicular traffic associated with residential use."

9

The history of the Hoppenraths' ownership of Lot 32 and other property, their compliance with the Easement Agreement, and their use of the Lane added another level of complexity to the story. In coordination with Pigg's husband, the Hoppenraths in 1990 paved the Lane from the public road that it intersected with to Lot 32, and Mr. Hoppenrath understood that "paving [the] Lane was done in order to comply with that ingress[-]and[-]egress agreement." Pigg also testified that paving was something that she had wanted done under the Easement Agreement and that it was done. Pigg claimed that she had demanded the $100 annual payment due under the Easement Agreement from the Hoppenraths but that the only payment she ever received was a $300 payment from the bank as a result of a reminder she had sent to the bank regarding the payment requirement in the Easement Agreement.

The story became even more complicated because the Hoppenraths acquired a second means of access to Lot 32. Specifically, the Hoppenraths acquired a tract adjoining it to the north and paved a driveway from Lot 32 through the adjoining tract to a public road. Mr. Hoppenrath claimed that he had nevertheless continued to use the Lane to access Lot 32. But Pigg claimed that she had written the Hoppenraths offering to revoke the Easement Agreement because he now had other access to Lot 32. Mr. Hoppenrath did not remember responding to the letter. Pigg testified that Mr. Hoppenrath had chained the gates that hung over the concrete approaches to the Lane and that she had never seen the Hoppenraths use the Lane "after that." Pigg believed that the Easement Agreement had "lapsed." Pigg stated

10

her belief that the public did not have the right to use the Lane and that the Easement Agreement had not been "met," and she said that she had made the people who had used the Lane without permission "aware" of her belief that the Easement Agreement "had not been met."

The jury disagreed with Pigg that the Easement Agreement had lapsed. The jury found that "the Easement Agreement, if any, [had not] terminate[d] because of Callaway's predecessors[-]in[-]interest's failure to make specified annual payments."

In 2002, the Hoppenraths conveyed both Lot 32 and the lot adjoining it to the north to Callaway's father-in-law. Pigg testified that she never saw Callaway's father-in-law use the Lane and that the gates accessing it remained chained. But Callaway testified that her father-in-law used the Lane to get to the house built on Lot 32 and that when she visited her father-in-law, she used the Lane as well.

Callaway inherited Lot 32 and the lot to the north of it. As we will detail when discussing the issues raised by Callaway, the record shows disagreement about the use of the Lane and the discussions between the parties. Callaway acknowledges that she never spoke to Pigg and instead spoke only to her daughter Robin (who owned property where the Lane joined the public road). Pigg claimed that requests were made in 2019 that those using the Lane cease doing so; Robin conveyed that request.

One core of the factual controversy at trial was differing testimony about whether Callaway had used the Lane for purposes not allowed under the Easement Agreement and whether she had made an offer to perform under the Easement

Agreement that was rejected by Pigg. As the answers that we outline shortly show, the jury found that Callaway had failed to comply materially with the Easement Agreement and that Pigg had not waived nor was she estopped to assert her claim that Callaway had failed to comply with the Easement Agreement. The jury also quantified the payment due to Pigg and the damages caused to the Lane by Callaway's use of it after breach of the Easement Agreement. The trial court declared that Pigg "is excused from any further performance of the . . . Easement Agreement . . . , and [Pigg] therefore has no further obligation to permit [Callaway] to use [Pigg's] land [as described in the judgment]."

### B. Procedural Background

The disagreement between Pigg and Callaway about the use of the Lane eventually resulted in the litigation below. The jury found that Pigg should have discovered Callaway's failure to comply with the Easement Agreement in December 2019. Pigg sued Callaway in October 2021.

In her live petition, Pigg sought declarations that Callaway was not authorized to use the Lane and that use of it was a trespass, that the Lane was never dedicated to public use, that rights under the Easement Agreement had expired "due to adverse possession," and that the Easement Agreement did not give Callaway the right to use the Lane. The petition also asserted claims for trespass and alternative claims to quiet title and for breach of contract. Callaway filed counterclaims, and her live counterclaim sought declarations that the Lane was dedicated to public use and that

12

Callaway had "the right to use [the] Lane pursuant to an express, written [E]asement [A]greement." The counterclaim also alleged that Pigg's interference with the Easement Agreement had breached it. Both sides sought their attorney's fees.

The trial court resolved one issue before trial when it granted Pigg's summary-judgment motion to establish that Callaway was not entitled to a claim for an implied easement.[4] The remainder of the claims were submitted to the jury with one exception: the trial court refused to submit questions addressing whether Pigg had held the Lane by adverse possession.

A charge consisting of fourteen questions was submitted to the jury. Because of conditioning instructions in the charge, the jury answered only eight of the questions. Without detailing the instructions that accompanied the questions, the jury questions and answers were as follows:

- "Did the 1973 Plat dedicate [the] Lane to the public?" No

- "On what date did the parties intend the Easement Agreement, if any, to become effective?" 1990

- "Did the Easement Agreement, if any, terminate because of Callaway's predecessors[-]in[-]interest's failure to make specified annual payments?" No

- "Did Callaway fail to comply with one or more conditions of the Easement Agreement, if any?" Yes

- "Did Pigg waive her claim regarding Callaway's failure, if any, to materially comply with the Easement Agreement?" No

---

[4]No issue is raised on appeal about that ruling.

13

- "Is Pigg estopped from claiming [that] Callaway materially breached the Easement Agreement based on nonpayment?" <u>No</u>

- "By what date should Pigg, in the exercise of reasonable diligence, have discovered Callaway's failure to comply with the Easement Agreement?" <u>12/15/2019</u>

- "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Pigg for the damages, if any, that resulted from Callaway's failure to comply?"

  > Element A: The amount of money owed to Pigg for failure to pay the contractual fees.
  >
  > 1. Element A sustained in the past.
  > Answer: <u>$500.00</u>
  >
  > Element B: Damage to the property caused by Callaway's use after [she] breached the Easement Agreement.
  >
  > 2. Element B sustained in the past.
  > Answer: <u>$11,044.50</u>

The parties agreed that the question of attorney's fees would be submitted to the trial court. A number of postverdict and postjudgment motions were filed. Eventually, the trial court signed an amended final judgment that contained a number of declarations:

- No implied easement across Pigg's land existed in favor of Callaway;

- The 1973 Plat did not create any public rights in any part of Pigg's land, and Callaway could not use Pigg's land to access Briar Road by virtue of the 1973 Plat;

14

- Callaway is not a successor to the 1990 Easement Agreement, and the 1990 Easement Agreement therefore granted Callaway no rights to use Pigg's land; and

- Pigg is excused from any further performance of the 1990 Easement Agreement, and Pigg therefore has no further obligation to permit Callaway to use Pigg's land.

The judgment also awarded Pigg $93,750.00 in attorney's fees through judgment and fees on appeal.

Both Callaway and Pigg filed notices of appeal directed to the amended final judgment.

## III. Analysis

### A. We overrule Callaway's first issue that challenges the jury's determination that the Lane was not dedicated to public use.

In her first issue, Callaway challenges the trial court's declaration that the Lane was not dedicated to public use, arguing that the jury's answer to Question 1 was contrary to the facts conclusively proven and against the great weight and preponderance of the evidence. We disagree. The parties presented contrasting views of the intent revealed by the 1973 Plat, and the jury simply resolved that question against Callaway.

#### 1. We set forth the jury question on the issue of dedication.

The jury answered the charge's Question 1, deciding that the 1973 Plat did not dedicate the Lane to the public. The trial court's charge phrased the dedication issue primarily in terms of an interpretation of the 1973 Plat:

15

Did the 1973 Plat dedicate [the] Lane to the public?

You are instructed that for [the] Lane to be dedicated to the public by the 1973 Plat:

1.      the Johnsons must have owned the property to be dedicated;

2.      the dedication must have served a public purpose;

3.      the Johnsons must have made a clear and unequivocal express or implied offer to dedicate [the] Lane to the public['s] use; and

4.      there must have been an acceptance of that offer by the public.[5]

It is your duty to interpret whether the [1973] Plat is a clear and unequivocal express or implied offer to dedicate [the] Lane to the public's use. You must decide its meaning by determining the intent of the Johnsons at the time of the [1973] Plat. Consider all the facts and circumstances surrounding the making of the [1973] Plat, the interpretation placed on the . . . [1973] Plat by the parties, and the conduct of the parties.

You are further instructed that all parts of a written instrument must be harmonized and given effect if possible, but in case of a conflict, the more specific provisions, such as metes-and-bounds descriptions, will control over general expressions.

Acceptance by the public need not be express; rather, an implied acceptance by the public is sufficient. The required use of the roadway by the public need not be for any specified length of time[,] and a short period of use generally is sufficient, so long as the use continues for such a period that it may be inferred that the public desires to accept in perpetuity the offer of use.

---

[5]These elements of dedication are established by our opinion in *Spinuzzi v. Town of Corinth*, 665 S.W.2d 530, 532 (Tex. App.—Fort Worth 1983, no writ).

Callaway raises no challenge to the form of the question, and we are guided by the standards established in an unobjected-to jury-charge question. As the Texas Supreme Court has previously noted,

> Our review is restricted to the jury charge as submitted when there was no objection to the instruction. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 254 (Tex. 2008). "[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) [(op. on reh'g)] (citing Tex. R. Civ. P. 272, 274, 278, 279). Even if another legal theory was argued to the jury and explained by the lawyers in argument, we are bound by the instructions given to the jury and presume that the jury followed those instructions. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 861–62 (Tex. 2009).

*Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407 (Tex. 2016).[6]

### 2. We set forth the legal-sufficiency standard of review for a matter-of-law evidentiary challenge.

Because Callaway bore the burden of proof on the question of dedication, to carry the day on her legal-sufficiency challenge, "she must demonstrate on appeal that

---

[6]Callaway raised an objection at trial to the following portion of Question 1:

Starts with, "You are further instructed that all parts of a written instrument must be harmonized and given effect if possible, but in the case of conflict, the more specific provisions, such as metes[-]and[-]bounds description[s], will control over general expressions." Object to that inclusion. We believe that that is only appropriate for cases when there is ambiguity[] and that there has been no finding of ambiguity[] and that . . . this question as is would be appropriate without inclusion of that paragraph in there.

Callaway raises no claim of error based on the trial court's overruling of this objection.

the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). A matter-of-law sufficiency challenge has a two-pronged analysis:

- "In reviewing a 'matter of law' challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Id.*

- "If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition [to the finding made] is established as a matter of law." *Id.* "The point of error should be sustained only if the contrary proposition is conclusively established." *Id.* Evidence conclusively establishes a fact when the evidence leaves "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019).

We may hold that no evidence supports a finding only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged

18

finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

### 3. We overrule Callaway's matter-of-law challenge to the jury's answer to Question 1.

The 1973 Plat represented the property being dedicated as follows:



A central part of Callaway's legal-sufficiency challenge is directed to the third element established in Question 1's first paragraph regarding whether the party who prepared the 1973 Plat "must have made a clear and unequivocal express or implied offer to dedicate [the] Lane to the public['s] use." A later instruction again emphasized, "It is your duty to interpret whether *the* [*1973*] *Plat* is a clear and unequivocal express or implied offer to dedicate [the] Lane to the public's use."

19

[Emphasis added.] Again, the charge instructed the jury to look to the 1973 Plat's "meaning by determining the intent of the Johnsons at the time of the [1973] Plat" and told the jury to harmonize the 1973 Plat's terms, "but in case of a conflict, the more specific provisions, such as metes-and-bounds descriptions, will control over general expressions."

Both sides presented expert testimony to interpret the 1973 Plat. Because the first step of a matter-of-law legal-sufficiency challenge looks only to evidence supporting the finding, we will look first to Pigg's expert's testimony to determine whether it contains some evidence to support the jury's negative answer on the question of whether the Lane was dedicated to public use. We conclude that Pigg's expert provided some evidence that the Johnsons did not make a clear and unequivocal offer to dedicate the Lane.

Pigg's expert opined that the 1973 Plat did not dedicate the Lane to public use. He predicated that opinion on several features of the 1973 Plat.

First, he emphasized that the Lane was defined by dotted lines and drew the following conclusion from that circumstance:

> [(By Pigg's attorney)] Tell me what some of the things were that led you . . . to that conclusion. And I'll try to put them up on the screen as you're talking.
>
> A. Okay. As I would with most any plat, I looked to see where the solid lines were that encompassed the item in question that is the plat. I also looked to see where the dotted lines were for adjoining items.

Q. And let me stop you there and ask a question about -- what's the difference between a solid line and a dotted line? Are they meant to signify different things?

A. In most cases, a dotted line is part of either easement[]. And, in this case, also, it shows adjoining features.

Q. Adjoining features like Lot 7, for example?

A. Yes, ma'am.

Q. Okay. And would Briar Road be another adjoining feature?

A. Certainly, yes, ma'am.

Q. And by -- what do you mean by "adjoining feature"?

A. Well, "adjoiners" is a word we use a lot in describing property and in surveying. Anything that is common in boundary to our subject property.

Q. Is that sort of saying that things like Lot 7 and Briar Road were just references on this plat?

A. It was shown to be an adjoining feature, yes, ma'am.

. . . .

Q. (By [Pigg's attorney]) Does an adjoining feature -- is it part of what's dedicated in the plat?

A. Would not be intended to be, no, ma'am.

Pigg's expert also relied on the fact that the Lane was not included by name or dimension within the metes-and-bounds description included in the 1973 Plat. The expert summed up his view that the 1973 Plat did not dedicate the Lane:

On the [1973 P]lat itself, there's not much else to see. I mean, there's not a lot of adjoining property mentioned in the description or in the

picture. The dotted lines showing [the] Lane are incidental, in my mind, just outlines a feature that's on the ground but is not being considered as part of this plat.

Pigg's expert was also asked whether he had considered and how his opinion was affected by certain verbiage in the affidavit that accompanied the 1973 Plat; the affidavit stated, "We hereby dedicate or adopt all streets and easements as shown thereon." Pigg's expert testified, "The use of 'all streets and easements' is pretty much boilerplate language for plat dedications."

Next, Pigg's expert was asked whether he had considered county regulations in the platting of roads in formulating his opinions. He emphasized the portion of the regulations that require "the location and width of existing and dedicated streets, roads, [and] lots . . . to be in reasonable detail." Because of the absence of a width, Pigg's expert testified that he could not locate the Lane on the ground. Nor, in Pigg's expert's opinion, did he have the width required by the regulations for a public road.

Callaway's counsel vigorously attacked Pigg's expert on cross-examination, but to little avail. The attacks took the following form:

- When challenged about the 1973 Plat's statement that the owners "hereby dedicate or adopt all streets and easements as shown thereon," Pigg's expert held to his position that the Lane was a feature and not shown as a street;

- Pigg's expert remained steadfast that if there had been an intent to dedicate the Lane, it would have been included within the 1973 Plat's metes-and-bounds description and that it was understandable that a public road previously dedicated was also not included with that description;

22

- Though the county regulations require that roads not dead-end, and though the Lane was the only way a road that was dedicated would not dead-end, not all regulations were followed in platting; and

- Though a property owner cannot be landlocked, lots shown on the 1973 Plat had access through other property or could be granted an easement.

Callaway argues that we should ignore the raft of opinions offered by Pigg's expert for the following reasons:

> [Pigg's expert] conceded that the [1973 P]lat explicitly states, "The owners hereby dedicate or adopt all streets and easements as shown thereon," which directly contradicts his claims that [the] Lane was not intended for public use. [Pigg's expert] further admitted that excluding [the] Lane from public dedication would lead to other roads within the subdivision dead-ending, such as Spring Road. And importantly, [Pigg's expert] admitted that he "*did not consider circulation* at all in [his] opinion," including whether properties would be landlocked, underscoring a critical lapse in his analysis. [Record references omitted.]

Then, Callaway argues that Pigg's expert's opinion fails when contrasted with Callaway's expert's opinion:

> Pigg's evidence therefore falls far short, especially when viewed in the context of the broader evidence. . . . Callaway's expert[] testified that the [1973 P]lat dedicated [the] Lane to public use. The acts surrounding the 1973 Plat, in the light of the entire instrument, conclusively demonstrate an intent to make a public declaration. [Record reference omitted.]

Callaway makes no argument that Pigg's expert's opinions were inadmissible—only that they were flawed. As we have noted, Pigg's expert placed great reliance on the fact that the Lane was notated by a dotted line. Though their holdings are not on all fours with this case, Texas courts note that the use of different types of lines—such as dotted lines—impacts the question of whether a plat is intended to dedicate a

road to public use.  For example, the Dallas Court of Appeals has examined the presence of dotted lines to describe a road and has concluded that such a notation might show a lack of intent to dedicate:

> In order to constitute a dedication[,] there must be a clear and unequivocal intention to dedicate.  In the instant case as we have already pointed out, the second plat filed by [appellee] shows the part of Ocalla Street now in dispute only by dotted lines.  While such a plat might be accepted as some evidence of an intention to dedicate, other circumstances might be accepted as evidence that the plan by which the tract was to be subdivided had not yet been definitely determined.  The fact that streets are shown on a plat by dotted lines is evidence that the intention to dedicate is only prospective[] and that the streets actually have not yet been laid out.  We therefore cannot accept [appellee's] second plat as conclusive evidence of his intention to dedicate the strip here involved.

*City of Dallas v. Crow*, 326 S.W.2d 192, 196 (Tex. App.—Dallas 1959, writ ref'd n.r.e.) (citations omitted);[7] *see also Baskin v. Jeffers*, 653 S.W.2d 480, 482 (Tex. App.—Beaumont 1983, writ ref'd n.r.e.) ("The broken lines, insofar as they are sought to prove the boundary lines of the disputed area, are not sufficient to constitute a clear,

---

[7]On rehearing, the Dallas Court of Appeals changed its rationale and held that the party filing the plat was estopped to deny a dedication. *City of Dallas*, 326 S.W.2d at 198 (op. on reh'g).  Callaway cites this portion of the opinion in her reply brief for the proposition that "[w]hile dotted lines may sometimes suggest a *prospective* dedication, they do not, as a matter of law, negate a clear and recorded intent."  The point that Callaway is trying to make is unclear.  The presence of dotted lines is undoubtedly a factor to consider in resolving the fact question of intent.  The reply brief also claims that "[t]he 1973 Plat labels [the] Lane by name, places it within a defined subdivision, and includes an express dedication of 'all streets and easements as shown thereon.'"  As we explain, Callaway is simply emphasizing the facts within the evidentiary mix that support her position and are countered by Pigg's expert who outlined why the Lane was not included with the 1973 Plat.

definite, and fixed boundary line.").[8]  We have held that the presence of a dotted line

may be viewed as "some evidence" of an intent to dedicate.  *Street v. Chance*, No. 02-

[8]Out-of-state cases also note the interpretive task involved in analyzing the marks on a plat.  As part of the sample, the Supreme Court of Rhode Island held that

> [v]ery often lines and figures drawn on a land-development plat may be unclear as to their intended purpose.  When such a case arises, it is the task of the factfinder to interpret the meaning of the disputed item by careful scrutiny of all lines, figures, and letters that appear on the map as well as whatever pertinent evidence may be adduced by the litigants. Each element of the plat is to be given a meaning, and no part can be considered as superfluous.

*Robidoux v. Pelletier*, 391 A.2d 1150, 1155 (R.I. 1978) (citation omitted).

The same court later reemphasized the principle that it is a factfinder's task to interpret the marks on a plat:

> Although "[i]n certain cases, . . . a recorded plat is all that is needed to disclose a landowner's dedicatory intent," *Robidoux*, . . . 391 A.2d at 1155, we also have recognized that application of this "principle to the facts of a given case is not quite as automatic a process" as it may appear. *Id.*  In situations in which "*lines and figures drawn on a land-development plat* may be unclear as to their intended purpose," this [c]ourt has held that "it is the task of the fact[]finder to interpret the meaning of the *disputed item* by careful scrutiny of all lines, figures, and letters *that appear on the map* as well as whatever pertinent evidence may be adduced by the litigants." *Id.* . . . "Each element of the plat is to be given a meaning, and no part can be considered as superfluous." *Id.*  Thus, the first task of the fact[]finder is to examine the plat, particularly the lines and declarations that relate to the disputed land, to determine whether this evidence gives rise to a finding of no dedicatory intent or whether it is ambiguous.

*Newport Realty, Inc. v. Lynch*, 878 A.2d 1021, 1033–34 (R.I. 2005).

As the Supreme Court of New Hampshire has noted, simply placing a mark on a plat does not produce an automatic result; it is an interpretive task to understand the mark's meaning:

18-00409-CV, 2019 WL 2293185, at *7 (Tex. App.—Fort Worth May 30, 2019, no pet.) (mem. op.) ("The amending plat shows the future extension of Cottonwood Springs by means of a dotted line. A plat showing a dotted line is some evidence of an intention to dedicate."). Thus, Pigg's expert's opinion—that the dotted lines on the 1973 Plat do not conclusively show an intent to dedicate—is borne out by case law. And as we have noted, Pigg's expert would not concede that the other challenges raised by Callaway's counsel undermined his opinion.

In light of the fact that Callaway does not argue that the opinions were so flawed that they were inadmissible, we grope for a theory as to why we should wholly discount Pigg's expert's opinions. Apparently, Callaway is invoking the principle set out in *City of Keller* that we cannot give weight to an expert's opinion that is supported by unfounded assumptions:

> Although the pla[t] shows the paper street, as well as the [appellees'] one-rod right of way, it refers to both of these as rights of ways. It does not refer to the paper street as a "proposed" street or a "public" street[] but as a right of way, just as it refers to the [appellees'] private one-rod right of way. *See Wright v. Town of Matthews*, . . . 627 S.E.2d 650, 659 ([N.C. Ct. App.] 2006) (deed that did not specify whether right of way was private or public did not constitute offer to dedicate public right of way). At best, the pla[t] shows the paper street to demonstrate the location of one of the boundaries of Lot 2 of the [appellants'] proposed subdivision. "[S]imply placing a line or a mark on a plat or delineating a way or a street for boundary purposes is insufficient to establish conclusively the original owner's intent to offer the property for dedication."

*Hersh v. Plonski*, 938 A.2d 98, 105 (N.H. 2007).

26

And if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded.

After we adopted gate[]keeping standards for expert testimony, evidence that failed to meet reliability standards was rendered not only inadmissible but incompetent as well. Thus, an appellate court conducting a no-evidence review cannot consider only an expert's bare opinion[] but must also consider contrary evidence showing it has no scientific basis. Similarly, review of an expert's damage estimates cannot disregard the expert's admission on cross-examination that none can be verified.

Thus, evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent. Again, such evidence cannot be disregarded; it must be an exception either to the exclusive standard of review or to the definition of contrary evidence.

168 S.W.3d at 813 (footnotes omitted).

We disagree that Pigg's expert's opinions are based on such flawed assumptions that they constitute no evidence. We have noted that the task of interpreting a plat is a holistic endeavor. The fact that a dotted line carries significance in that endeavor is not attacked by Callaway and, from the cases we have cited, is a part of the task of interpreting the features of a plat. Callaway's argument is predicated on the conclusion that whatever vagueness was created by the use of the dotted line to describe the Lane as an incidental feature and the failure to include it within the metes-and-bounds description of the dedicated property is negated by the affidavit that accompanied the plat; that affidavit stated that the filers "dedicate[d] or adopt[ed] all streets and easements as shown thereon." But again, Pigg's expert testified that

27

because the Lane was depicted on the plat as an incidental feature and was not included in the metes-and-bounds description of the dedicated property, it would not fall within the ambit of the quoted language.[9]

Expert opinions that are based on unfounded assumptions are not evidence, but the fact that there is some weakness in an opinion does not render it unreliable—the relative weakness of the opinion goes only to the weight that it should be accorded. *In re Germania Select Ins. Co.*, No. 12-24-00342-CV, 2025 WL 555772, at *3 (Tex. App.—Tyler Feb. 19, 2025, orig. proceeding) (mem. op.).[10] Here, Callaway does

---

[9]In her reply brief, Callaway makes the statement that "[t]he 1973 Plat labels [the] Lane by name, places it within a defined subdivision, and includes an express dedication of "all streets and easements as shown thereon." She then cites a case holding that a property description that fails to include metes and bounds may be adequate to meet the statute of frauds and cites two other cases in which a plat contained a notation that it dedicated public roads shown on the plat. *See Aaron v. Caddo Mins., Inc.*, No. 11-22-00020-CV, 2023 WL 5622115, at *5 n.8 (Tex. App.—Eastland Aug. 31, 2023, pet. denied) (mem. op.); *Braun v. Braun*, No. 04-09-00486-CV, 2010 WL 2513428, at *4 (Tex. App.—San Antonio June 23, 2010, pet. denied) (mem. op.); *Miller v. Elliott*, 94 S.W.3d 38, 45 (Tex. App.—Tyler 2002, pet. denied). We have already outlined Pigg's expert's testimony that the Lane was a feature as described on the 1973 Plat. If it is Callaway's argument that the cases cited in her reply brief stand for the proposition that the road-dedication language rules over all else in interpreting a plat, the cases that she cites do not support that proposition.

[10]As *Germania* explained,

"An expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed." Tex. R. Evid. 703. "The weakness of facts in support of an expert's opinion generally go to the weight of the testimony rather than its admissibility." *In re Payne*, 605 S.W.3d 240, 246 (Tex. App.—San Antonio 2020, orig. proceeding); *In re Fire Alarm Servs., Inc.*, No. 04-22-00160-CV, 2022 WL 2820936, at *3 (Tex. App.—San Antonio July 20, 2022, [orig.

28

not argue that Pigg's expert's interpretation lacked a foundation but that his interpretation was flawed because he should have interpreted the 1973 Plat to give play to provisions that Callaway views as important. This does not render Pigg's expert's opinions so unreliable that they constitute no evidence.

Nor does Callaway acknowledge one of the trial court's instructions in Question 1 that we have already highlighted: "You are further instructed that all parts of a written instrument must be harmonized and given effect if possible, but in case of a conflict, the more specific provisions, such as metes-and-bounds descriptions, will control over general expressions." In essence, the instruction tells the jury that it should follow the lead of Pigg's expert and that conducting a holistic interpretation of a plat is the norm. Callaway does not challenge this instruction on appeal. Callaway disagrees with how the jury resolved the task that the charge gave to balance the 1973 Plat's provisions. That is not the basis for a no-evidence challenge.

---

proceeding]) (mem. op.). [The expert's] opinions and crash report are based on his training and experience, observations of the physical evidence, and interviews with witnesses. [Real party in interest (RPI)] claims that [the expert's] opinions contradict the evidence and witness statements, which make his opinion unreliable. However, [RPI's] disagreement with [the expert's] opinion goes to the weight of [the expert's] testimony and not its admissibility. *Fire Alarm Servs.*, 2022 WL 2820936, at *4 (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex. 1998)[, and holding that] although trial court has threshold responsibility to ensure tha[t] an expert's opinion is reliable and relevant, Rule 702 gatekeeping function does not supplant cross-examination as appropriate means of attacking evidence).

*Id.*

29

Nor do we agree that Pigg's expert made a "critical lapse" in his analysis by not conceding that the Lane must have been dedicated because county regulations required that a road dedicated in a plat should not dead-end. The basis for this challenge was that Spring Road, which was dedicated in the 1973 Plat, would dead-end the Lane were it not also dedicated. The exchange that Callaway references reveals Pigg's expert's being cross-examined and defending his opinion without a concession that his opinion was flawed or that the fact he ignored was vital to his opinion:

Q. Without [the] Lane, Spring Road would dead-end, wouldn't it?

A. It would.

Q. So that indicates to you that [the] Lane is part of the circulation of roads included in this plat, doesn't it?

A. I did not consider circulation at all in my opinion.

Q. That's a requirement of roads, is that they provide circulation and they can't dead-end, right?

A. Sir, let me be perfectly clear. Not all of these regulations were, at that time, or ever have been entirely followed in platting.

Q. And that includes the width of roads, doesn't it?

A. Yes, sir.

Q. Because you can have roads that have width based on actual usage, right?

A. There is such a thing, yes, sir.

Q. You did not survey this land, did you?

30

A. No.

Q. And there would have been no need to identify [the] Lane on this plat map unless it was a road needed for the circulation of Spring Drive, would it?

A. I cannot say that. I would say, again, as I testified earlier, it was there as an adjoining feature, period.

Again, this exchange does not make unfounded the foundation of Pigg's expert's opinion that the way that the Lane was depicted in the 1973 Plat indicated that it was not included as a roadway but as an adjoining feature. Thus, it does not demonstrate that the fundamental assumption of Pigg's expert's opinion was flawed.

We do not move beyond the first step of Callaway's matter-of-law no-evidence challenge. We hold that there is some evidence supporting the jury's answer to Question 1.

### 4. Callaway's factual-sufficiency challenge to the jury's answer to Question 1 fails.

In her first issue, Callaway also raises a factual sufficiency challenge to the jury's answer to Question 1. Her argument under the factual-sufficiency challenge is a rehash of the legal-sufficiency argument and is no more persuasive than that argument.

When a party attacks the factual sufficiency of the evidence on an adverse finding on which she has the burden of proof, that party must show that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and

31

weighing all evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

The entirety of Callaway's argument that the jury's answer to Question 1 is against the great weight and preponderance of the evidence on the question of whether the 1973 Plat revealed an intent to dedicate is as follows: "The 1973 Plat explicitly adopted 'all streets and easements as shown thereon,' which included [the] Lane, even though it was depicted with dotted lines. . . . Callaway's expert[] confirmed this dedication in testimony, highlighting the Johnsons' intent." [Record reference omitted.] Again, this is an effort to say "our expert's opinion is better than their expert's opinion" and is no basis to conclude that Pigg's expert's opinion lacked a defensible foundation. Instead, it reveals a battle of the experts in which the jury found Pigg's expert to be more convincing. Our involvement in that battle is limited:

> In a battle of competing expert testimony, it is the sole prerogative of the fact[]finder to determine the weight and credibility of the witnesses, the obligation of the respective advocates to persuade them, and "our obligation to see that the process was fair and carried out according to the rules."

*K.T. v. M.T.*, No. 02-14-00044-CV, 2015 WL 4910097, at *9 (Tex. App.—Fort Worth

Aug. 13, 2015, no pet.) (mem. op.). It is the jury's role and not ours to referee the

battle. The jury performed its function, and we will not second-guess its resolution.[11]

---

[11]At various points in her brief, Callaway appears to suggest that there was an implied dedication of the Lane. For example, her brief states that

> [t]he 1973 Plat explicitly reflects the Johnsons' intent to dedicate [the] Lane for public use. Callaway's expert testified that the [1973] Plat's language and representation supported *this intent under Texas law, which allows dedication to be implied through conduct*, not requiring express declarations. [Emphasis added.]

It does not appear that Question 1 submitted the question of implied dedication to the jury. And Callaway never provides the standards for an implied dedication or argues how the evidence meets those standards. The El Paso Court of Appeals outlined the standards as follows:

> There are four essential elements of implied dedication: (1) the acts of the landowner induced the belief that the landowner intended to dedicate the road to public use; (2) he was competent to do so; (3) the public relied on these acts and will be served by the dedication; and (4) there was an offer and acceptance of the dedication. *Las Vegas Pecan & Cattle* [*Co. v. Zavala County*], 682 S.W.2d [254,] 256[ (Tex. 1984)]. Whether a public right-of-way has been acquired by dedication is a question of fact. *Lindner v. Hill*, 691 S.W.2d 590, 591–92 (Tex. 1985); *Viscardi v. Pajestka*, 576 S.W.2d 16, 19 (Tex. 1978).
>
> As a general rule, the intention to dedicate must be shown by something more than an omission or failure to act or acquiesce on the part of the owner. *Greenway Parks Home Owners Ass'n v. City of Dallas*, . . . 312 S.W.2d 235, 241 ([Tex.] 1958). There must be evidence of some additional factor that implies a donative intention when considered in light of the owner's acquiescence in the public's use of the roadway. *Long Island Owner's Ass'n v. Davidson*, 965 S.W.2d 674, 681 (Tex. App.—Corpus Christi[–Edinburg] 1998, pet. denied). The additional factor may include (1) permitting public authorities to grade, repair, or otherwise improve the roadway; (2) selling parcels of land from a plat or plan

We overrule Callaway's first issue.

**B.     We sustain Callaway's second and third issues because we conclude that rights under the Easement Agreement were assigned to Callaway's predecessors in interest.**[12]

Again, the trial court's judgment declares that Callaway

> [is] not [a] successor[] to the 1990 Easement Agreement recorded on November 5, 1990[,] at volume 10088, p.2164 of the Tarrant County Deed Records[] and [that] the 1990 Easement Agreement therefore grants [Callaway] no rights to use [Pigg's] land . . . .

Pigg describes the basis for this declaration and Callaway's attack on it as follows:

---

> showing the roadway as a means of access to the parcels; (3) construction of facilities for general public use; (4) an express representation by the owner of a road to a land purchaser that the way is reserved for public use; (5) fencing off the roadway from the remainder of the land; or (6) obtaining a reduction in the purchase price commensurate with the area of the roadway. *Id.*

*Baker v. Peace*, 172 S.W.3d 82, 87–88 (Tex. App.—El Paso 2005, pet. denied).

Callaway does not reference a factor supporting a finding of the donative intent that must support an implied dedication. To the contrary, Pigg testified that the Lane was never treated as a public road. When Lot 32 was sold, Pigg notified the buyers that their access to a public road was through their grantor's adjoining lot, and no one testified that the grantee was told that the lot had access by the Lane. The 1973 Plat did not plat Lot 32, which was sold by a metes-and-bounds description rather than solely by a reference to the plat. Thus, it does not appear that Lot 32 was indisputably sold from a plat or plan showing the roadway as a means of access to the parcels or that there was an express representation by the owner of a road to a land purchaser that the road was reserved for public use. We reject Callaway's undeveloped, cursory argument of implied dedication to the extent that argument is made.

[12]Even though we affirm the judgment of the trial court with respect to the relief it grants as to the use of the Lane, we address this question because it impacts the award of attorney's fees.

> In her second and third issues, Callaway claims error in the trial court's ambiguity finding and in the sufficiency of the evidence supporting the jury's finding that the Easement Agreement became effective in 1990. Because the Easement Agreement did not take effect until 1990 and because the [b]ank conveyed Future Lot 32 to the Hoppenraths in 1989, the Easement Agreement was not conveyed to the Hoppenraths, who are Callaway's predecessors in interest.

In other words, the judgment is predicated on the theory that because the Easement Agreement did not become effective until after the conveyance to the Hoppenraths, the bank conveyed them no interest in the easement. We disagree that no interest in the easement was ever passed to the Hoppenraths.[13]

Pigg does not argue that the Easement Agreement never came into existence but instead argues that because it came into existence after the conveyance to the Hoppenraths, they never acquired an interest in the easement. The fallacy in the argument is that the deed to the Hoppenraths not only conveyed ingress and egress but also conveyed appurtenances to the property and had a warranty of title. Even if Pigg's argument is correct that the Easement Agreement only became effective to convey the easement to the bank in 1990, the interest created by the agreement passed to the Hoppenraths at that time.

The special warranty deed from the bank to the Hoppenraths states that it conveys the ingress-and-egress easement described in an exhibit; the exhibit's legal description is the same legal description that is attached to the Easement Agreement.

---

[13]These are questions of construction, which are legal questions to which we apply a de novo standard of review. *Victory Energy Corp. v. Oz Gas Corp.*, 461 S.W.3d 159, 172 (Tex. App.—El Paso 2014, pet. denied).

It also recites that the bank as grantor conveys all appurtenances to the property being conveyed. And as Callaway points out, the Easement Agreement binds successors and assigns and runs with the land. Thus, it is an easement appurtenant. *See 425 Soledad, Ltd. v. CRVI Riverwalk Hosp., LLC*, 709 S.W.3d 551, 558 (Tex. 2024) (describing characteristics of access easement as easement appurtenant).

As the Fourteenth Court of Appeals has previously held, an easement appurtenant passes almost automatically with a conveyance of the land that it benefits but especially so when a deed conveys appurtenances:

> "An easement in which the benefits are for a specific parcel of land, regardless of the identity of the owner, are easements appurtenant." *Machala v. Weems*, 56 S.W.3d 748, 754 (Tex. App.—Texarkana 2001, no pet.); *see Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 203 (Tex. 1962) (explaining that an easement appurtenant benefits the property to which it is attached; it cannot be separated from the owner's rights in the land, and it passes with the property). An easement appurtenant passes by a deed's use of the word "appurtenant," but such an easement usually passes even without such an express reference in the deed. *See Holmstrom v. Lee*, 26 S.W.3d 526, 531 (Tex. App.—Austin 2000, no pet.); *see also Aery v. Hoskins, Inc.*, 493 S.W.3d 684, 700 (Tex. App.—San Antonio 2016, pet. denied) ("Therefore, any appurtenance (benefit or burden) to the conveyed land passes to the grantee even if not specified.").

> A warranty deed passes all the estate owned by the grantor at the time of the conveyance unless there are reservations or exceptions that reduce the estate conveyed. *Day & Co. . . . v. Texland Petroleum, Inc.*, 786 S.W.2d 667, 668 (Tex. 1990) [(op. on reh'g)]. The words "exception" and "reservation," though at times used interchangeably, each have their own separate meaning. *Klein v. Humble Oil & Refining Co.*, 67 S.W.2d 911, 915 (Tex. App.—Beaumont 1934), *aff'd*, . . . 86 S.W.2d 1077 ([Tex.] 1935). A reservation is the creation of a new right in favor of the grantor, while an exception operates to exclude some interest from the grant. *Wenske[ v. Ealy]*, 521 S.W.3d [791,] 806 [(Tex. 2017) (Boyd, J., dissenting)] (discussing exception); *Patrick v. Barrett*, 734 S.W.2d 646, 647

(Tex. 1987) (discussing reservation). Thus, to retain an appurtenant right, such as an easement, "a grantor must specifically reserve it for himself." *Aery*, 493 S.W.3d at 700.

*Target Corp. v. D&H Props., LLC*, 637 S.W.3d 816, 835–36 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

Clearly, if the easement existed when the conveyance was made, it would have passed to the Hoppenraths. Pigg argues that it did not exist, so no interest in the easement *ever* passed because no assignment was ever made by the bank once the easement "became effective." But that argument begs the question of whether the bank's deed to the Hoppenraths passed an interest in the easement once it did come into fruition.

Pigg does not argue that the Easement Agreement was void, simply that the preconditions to its effectiveness had not occurred. As Pigg highlights, there is evidence that the Easement Agreement described a strip that was not the Lane. But Pigg argues that this deficit was an ambiguity in the Easement Agreement that impacted when it became effective and not that it voided the agreement in total:

> Obviously, the Easement Agreement could not bind the grantor to give access to [the] Lane (a different strip of land more than twenty feet to the south of Future Lot 32), without something else happening. Indeed, the [b]ank – after drafting the [Easement] Agreement to require its signature – did not sign the [Easement A]greement for some twenty-two months after what Callaway claims as the "effective date." Callaway's contention is refuted by the [b]ank's October 4, 1990 signature. [Record references omitted.]

This argument does not undermine our holding that the Easement Agreement eventually came into fruition and created the easement. Indeed, Pigg accepted performance under the Easement Agreement in the form of payments and paving of a portion of the Lane, and the relief she sought and was granted was to be excused from performance under the Easement Agreement—not because it was void but on the ground that her performance was excused. Thus, the bank appears to have had some interest when the conveyance to the Hoppenraths was made because the Easement Agreement predated the deed, but we need not determine what that interest was.

Even if the easement did not come into fruition until after the conveyance to the Hoppenraths, the question is whether the interest that later came into fruition passed to the Hoppenraths because the bank had conveyed all appurtenances to them. The doctrine of after-acquired title shows that the interest did pass; that doctrine is described as follows:

> Under the after-acquired title doctrine, "when one conveys land by warranty of title, or in such a manner as to be estopped to dispute the title of his grantee, a title subsequently acquired to that land will pass *eo instante* to his warrantee, binding both the warrantor and his heirs and subsequent purchasers from either." *Hous*[.] *First Am*[.] *Sav. v. Musick*, 650 S.W.2d 764, 770 (Tex. 1983) (citing *Caswell v. Llano Oil Co.*, . . . 36 S.W.2d 208, 211 (Tex. [[Comm'n Op.]] 1931)).

*Hardy v. Bennefield*, 368 S.W.3d 643, 652 (Tex. App.—Tyler 2012, no pet.); *see also*

*Bradley v. Shaffer*, 535 S.W.3d 242, 247 (Tex. App.—Eastland 2017, no pet.) ("Under the doctrine of after-acquired title, 'when one conveys land by warranty of title, or in such a manner as to be estopped to dispute the title of his grantee, a title subsequently

acquired to that land will pass . . . to his warrantee,[']" and it binds "both the warrantor and his heirs and subsequent purchasers from either." (first citing *Hous. First Am. Sav.*, 650 S.W.2d at 770, and then quoting *Caswell*, 36 S.W.2d at 211)).  As a general proposition, easements are the type of interests that may pass under the doctrine of after-acquired title.  31 C.J.S. *Estoppel and Waiver* § 32 (May 2025 Update) ("Easements are property within the rule of estoppel as to after-acquired property.").

Utilizing the doctrine of after-acquired title to resolve Callaway's arguments under her second and third issues[14] renders both the base question of the ambiguity of the Easement Agreement and the jury's answer to Question 2 immaterial.  The ambiguity question is directed to whether the Easement Agreement was ambiguous as to when it had become effective, and Question 2 was the jury's answer resolving that question.  But even if we assume that the Easement Agreement did not become effective until 1990,[15] the easement passed to the bank's grantees, the Hoppenraths. The predicate of the trial court's declaration at issue is that the easement created by the Easement Agreement never passed into Callaway's chain of title.  For the reasons stated, we conclude that declaration is in error.

We sustain Callaway's second and third issues.

---

[14]We conclude that this argument is a subsidiary question fairly included under Callaway's second and third issues.  *See* Tex. R. App. P. 38.1(f).

[15]Because we do not find the date dispositive, we need not address Callaway's argument that there was no explicit requirement that the bank's representative's signature was a precondition for the Easement Agreement to become effective.

**C. We overrule Callaway's fourth issue challenging the trial court's declaration that Pigg is excused from performance of the Easement Agreement.**

In her fourth issue, Callaway argues that the evidence is legally and factually insufficient to support the jury's breach finding that was the basis of the trial court's declaration that performance of the Easement Agreement was excused. In essence, the argument is that Pigg's breach claim was predicated on Callaway's failure to make $100 annual payments pursuant to the Easement Agreement and that this failure was not a material breach of the Easement Agreement warranting the declaration that Pigg was excused from further performance of the Easement Agreement. As we interpret it, the argument is based on the premise that there is no factual dispute on two questions: (1) Callaway tendered the payments due under the Easement Agreement; and (2) Pigg refused that tender. The premise of this argument is wrong, and it ignores that the record reveals violations of the Easement Agreement that Callaway's argument disregards.

**1. We set forth the jury question on Callaway's failure to comply with the Easement Agreement, the resulting damages, and the trial court's declaration.**

Again, the question of whether Callaway failed to comply with the Easement Agreement involves charge Question 6, which Callaway does not contend was defective and to which the jury answered "yes":

Did Callaway fail to comply with one or more conditions of the Easement Agreement, if any?

40

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. The extent to which the injured party will be deprived of the benefit which he reasonably expected;

2. The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

3. The extent to which the party failing to perform or to offer to perform will suffer forfeiture;

4. The likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances, including any reasonable assurances; [and]

5. The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

For purposes of answering this question, you are instructed that the Easement Agreement provides that (1) beginning two years from the date of the agreement, the bank (or its successor) shall pay $100 per year for maintenance for so long as the easement shall continue to exist as a private ingress and egress and that (2) the easement shall be restricted to pedestrian and vehicular traffic for residential use.

The jury also made a damage finding in response to Question 10:

*What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Pigg for the damages, if any, that resulted from Callaway's failure to comply?*

Consider the following elements of damages, if any, and none other.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

Element A: The amount of money owed to Pigg for failure to pay the contractual fees.

41

1. Element A sustained in the past.

Answer: $500.00

*Element B: Damage to the property caused by Callaway's use after [she] breached the Easement Agreement.*

2. Element B sustained in the past.

Answer: $11,044.50  [Emphasis added.[16]]

In turn, the trial court's judgment decrees that

[Pigg] is excused from any further performance of the 1990 Easement Agreement recorded on November 5, 1990[,] at volume 10088, p.2164 of the Tarrant County Deed Records, and [Pigg], therefore, has no further obligation to permit [Callaway] to use [Pigg's] land . . . .

## 2. We set forth the standard of review.

The standard of review applicable to Callaway's legal-sufficiency challenge is as

follows:

When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). The jury, as the fact[]finder, is the sole judge of the witnesses' credibility and the weight to give their testimony. *Gunn*, 554 S.W.3d at 665 (citing *City of Keller*, 168 S.W.3d at 819). "It is the province of the jury to resolve conflicts in the evidence, and when reasonable jurors could resolve conflicting evidence either way, we presume they did so in accordance with the verdict." *Id.* (citing *City of Keller*, 168 S.W.3d at 820). We must defer to the jurors' determination of these matters and their resolution of conflicting evidence. *Id.* (citing *City of Keller*, 168 S.W.3d at 820).

---

[16]Pigg's brief states that the amended judgment did not include a damage recovery for the finding under Element B because of an election of remedies.

*Starry Skies Ranch, L.P. v. Chappell Hill Constr., Co.*, No. 01-22-00760-CV, 2024 WL 4628408, at *14 (Tex. App.—Houston [1st Dist.] Oct. 31, 2024, pet. denied) (mem. op.).

### 3. We overrule Callaway's argument predicated on her claim that undisputed evidence shows that she tendered performance.

In her brief, after setting out the jury's answer to Question 6 and the trial court's declaratory decree, Callaway begins an untethered explication of the law of tender. In essence, this explication sets out when a tender occurs and when a tender is excused.[17] It appears that Callaway is invoking rules that usually apply in the context of a tender made on an obligation to pay a sum certain and how a rejected tender will forestall liability for interest, costs, and attorney's fees. *See Strickland v. Coleman*, 824 S.W.2d 188, 193 (Tex. App.—Houston [1st Dist.] 1991, no writ) (holding that "[t]ender of the amount due and the subsequent refusal of that tender relieved [appellee] of the liability for the subsequent interest, costs[,] and attorney's fees" and that "[a] formal tender of the amount due is excused where the creditor has indicated that he is unwilling to accept what is due in discharge of the debt"). Callaway also cites cases in which the question of tender and the refusal of a tender affects the right to specific performance. An example of tender's application in such a context was recently dealt with by the Dallas Court of Appeals as follows:

---

[17]Our resolution of this issue on the basis that the evidence is not undisputed makes it unnecessary to address other arguments raised by the parties, such as whether Callaway failed to plead tender as an affirmative defense, whether it was subsumed within Callaway's denial of a breach, and whether the tender issue was tried by consent. *See* Tex. R. App. P. 47.1.

> It is a general rule of equity jurisprudence in Texas that a party must show that it has complied with its obligations under a contract to be entitled to specific performance. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594 (Tex. 2008). As a consequence, a plaintiff seeking specific performance, as a general rule, must actually tender performance as a prerequisite to obtaining specific performance. *Id.* A corollary to this rule is that when a defendant refuses to perform or repudiates a contract, the plaintiff may be excused from actually tendering its performance to the repudiating party before filing suit for specific performance. *Id.* In such a circumstance, a plaintiff seeking specific performance is excused from tendering performance pre[]suit and may simply plead that performance would have been tendered but for the defendant's breach or repudiation. *Id.* A repudiation or anticipatory breach occurs when a party's conduct shows a fixed intention to abandon, renounce, and refuse to perform the contract. *Harrison v. Blue Mountain Prop. Ventures LLC*, No. 05-23-00583-CV, 2024 WL 4457019, at *5 (Tex. App.—Dallas Oct. 10, 2024, no pet. . . . ) (mem. op.)[] (citing *Hunter v. PriceKubecka, PLLC*, 339 S.W.3d 795, 802 (Tex. App.—Dallas 2011, no pet.)). The repudiation must be absolute and unconditional. *Id.*

*World Food Imports, Inc. v. HHO United Grp., Inc.*, No. 05-22-01160-CV, 2024 WL 4553211, at *5 (Tex. App.—Dallas Oct. 23, 2024, pet. filed) (mem. op.).

How these concepts of tender relate to the argument that Callaway is making is not provided until we reach a footnote that quotes *Duke Energy Field Services, Inc. v. King Ranch, Inc.*, No. 13-03-434-CV, 2004 WL 2247423, at *2 (Tex. App.—Corpus Christi–Edinburg Oct. 7, 2004, no pet.) (mem. op.). *Duke* analyzed a summary-judgment ruling in favor of a plaintiff landowner who was attempting to terminate a right-of-way easement. *Id.* at *1. *Duke* held that the declaratory judgment issued in favor of the plaintiff exceeded the relief that had been requested. *Id.* at *3. *Duke* also addressed the question of whether failure to make payments under the easement agreement was a material breach when the easement holder had tendered the

44

payments due. *Id.* The opinion cited the factors to determine whether a breach was material; those factors substantially echo the factors contained in the trial court's instruction in Question 6 that was submitted to the jury. *Id.* (citing materiality factors established by *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)).

In essence, *Duke* held that the breach that arose from the failure to make payments was not material because payments under the easement agreement had been tendered:

> Appellants . . . argue that the breaches were *not* material because appellees can be easily and adequately compensated for the benefit they have lost. Appellants contend that they have already performed fully under the agreements by tendering the delinquent payments and future payments for the next five years. Appellants maintain that they stand "ready, willing, and able" to honor their obligations in the future. Additionally, appellants contend that they have acted in good faith at all times in their relations with appellees.
>
> Considering the factors set forth in *Hernandez*, we conclude that the breaches in this case were not material: (1) appellants are willing to tender the missed payments and have, in fact, done so, which demonstrates that appellees will not be deprived of their sole benefit under the agreements; (2) appellees can be fully compensated for the missed payments by an award of damages; (3) appellants have already attempted to cure their failure to perform by tendering the missed payments; (4) appellants have demonstrated their willingness to perform in the future by tendering payments for the next five years; and (5) there is no evidence that appellants acted in bad faith. *See* [875 S.W.2d at 692].

*Id.* at *4. Focused solely on the $100 annual payments due under the Easement Agreement, Callaway's theory is an effort to bring herself within the holding of *Duke* by arguing that she offered to make the payments and that Pigg unconditionally

45

rejected their tender. Her claim is that the testimony on both questions is undisputed.

We disagree.

To quote Callaway's brief, she relies on a single answer to contend that Pigg indisputably rejected a tender by Callaway:

> The undisputed evidence confirms that Callaway offered to pay any amounts owed under the Easement Agreement and that Pigg refused to accept the payment. Pigg testified[ as follows]:
>
> > Q. And did you know that after [Callaway] was asked about driving down [the] Lane, she offered to pay for it and to provide the paving for it?
> >
> > A. Well, I didn't want to accept a hundred dollars then.

This answer does not do all the work that Callaway claims that it does. The answer is unresponsive and does not even reflect comprehension of the question being asked. The question is vague—asking if Callaway "offered to pay for it" without specifying what "it" is. It reads too much into the question to convert the words "she offered to pay for it" into a meaning that "Callaway tendered payment in compliance with the Easement Agreement." Nor does the answer address the base question of whether Pigg even knew of some unspecified offer. Callaway's counsel made no effort to follow up on the answer to remedy the vagueness of Pigg's answer.

Apparently, the offer of payment that Callaway claims she indisputably made was made to Pigg's daughter Robin. But the evidence of an offer to Robin is also

disputed. We will simply quote the testimony that is cited by Callaway in her brief to support her assertion that a "tender" was made:

Q. [W]hen . . . Callaway was -- was using it one day, you came out and confronted her about use of the road, correct?

A. For mowing my -- my grass, yes.

Q. And the issue of maintenance and paying for use of [the] Lane came up, didn't it?

A. Not at that time, no.

Q. But it -- it was a subject of conversation between you and Ms. Callaway, correct?

A. I know I told -- talked to [Stormie's grandson] about it.

*Q. And you know that . . . Callaway has offered to pay for what they need to, if they owe anything for the road, and also offered to provide maintenance for the road, didn't they?*

*A. No.*

Q. And you said that you'd go talk to [Pigg] about it. And you never got back to her, did you?

A. That's the conversation I had with [Stormie's grandson]. [He] asked me why the chains were on the gate.

Q. Okay.

A. And I said because nobody uses the ease -- nobody used the easement for 30 years and never paid for it. He -- and he --

Q. And Ms. --

A. [Stormie's grandson] made the offer.

Q. [Robin], I didn't ask you that.

47

A. Okay. So sorry.

Q. So it's nonresponsive. I know you want to get that in.

A. No. I --

Q. But listen to my question.

A. Okay.

*Q. An offer was made to maintain -- to pay for the road and to maintain the road by the Callaways, correct?*

*A. No.* [Emphasis added.]

To counter Robin's testimony, Callaway claims that she did make an offer to Robin. But the evidence that Callaway cites to establish an undisputed proposition references some vague offer and contains an outright denial that Callaway made any offer. The state of the record put it within the jury's province to determine whether an offer—or tender—was made. *See Starry Skies Ranch*, 2024 WL 4628408, at *14.

As an additional point, the jury received no instruction on the principle of tender that Callaway invokes. Instead, the closest that Question 6 came to the discussion of tender was the guidance found in a subpart of Question 6's instruction that told the jury to consider "the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances, including any reasonable assurances." Callaway makes no effort to analyze the evidence through the prism of this instruction.

48

Beyond the failures in Callaway's arguments that we have already cataloged, her arguments are myopic because their sole focus is whether the failure to make payments under the Easement Agreement is a material breach. As we have already noted, Question 6 instructs the jury that the Easement Agreement not only requires payment but also provides that "the easement shall be restricted to pedestrian and vehicular traffic for residential use." The record contains evidence that this provision was breached, and Callaway does not address this evidence, much less argue that it is insufficient to support the jury's answer to Question 6.

The jury heard Robin's description of the uses to which Callaway had put the Lane:

Q. So during all this time, then, did the Callaways start using [the] Lane?

A. Well, they -- they started about Christmas of 2019, yes.

Q. Tell me what kind of vehicles you saw using [the] Lane.

A. Corvettes, motorcycles, trucks.

Q. Did you see heavy equipment?

A. There were times that they pulled trailers out in the middle of the night. Midnight one night, they had a travel trailer sitting on a flatbed that they pulled out of the far east end. They just almost couldn't get out. They were this far from our fence in the ditch when they turned that corner.

Q. What times --

A. Trailers, trucks hauling cars.

49

Q. Did you come to believe -- or do you have a belief about whether or not they were using [the] Lane for business purposes, nonresidential purposes?

A. Oh, definitely.

Q. Tell me about that. Why do you think that?

A. Well, their business is rent houses. And they -- I'm sure they rehab them and have dump trailers and trailers that they haul new stuff into them.

Q. I'm going to show you what's been admitted as Plaintiff's Exhibit 43. Is this a fairly recent picture of -- or do you -- hang on.

A. Yeah, the last couple of years.

Q. Okay. I'm going to blow up part of it here.

Can you tell me what is in that corner of that lot on Exhibit 43?

A. Boats, Ski-Doos, watercraft.

Q. What's your estimate as to how many there are?

A. I think I lost count after about 25.

Q. Tell me what times of the day you hear these vehicles going up and down [the] Lane to the Callaways' property.

A. It varied. I mean, they would start anywhere from 9:30 at night, and they'd come back at 4:30 in the morning. And it would be in and out all night long. There's one -- one someone that he -- he would drive out Reed Road, come around, drive up [the Lane], and pull in the driveway. He'd turn around, and come back out this way, and go back in Reed Road. Excuse me. I don't know who it was . . . .[18]

---

[18]In her reply brief, Callaway for the most part ignores this testimony and states that "[a]t most, witnesses testified that horses were transported or kept on the property and [that] boats were stored temporarily—activities consistent with residential or recreational use." The reply brief cites only testimony from a prior

50

Robin also testified—which testimony was also ignored by Callaway in her brief—that the portion of the Lane being used by Callaway and her family was degrading faster than the remainder of the Lane. Estimates obtained to repair the damage were admitted. Robin testified that the estimates were to repair the damage done to the Lane from its improper use:

> Q. And is Exhibit 22 the estimate to repair the damages you think . . . Callaway[ and her family] have contributed to, have caused?
>
> A. I'm sorry?

---

owner of Lot 32 and Callaway's testimony describing the use of the lot, ignoring Robin's testimony. Again, Callaway cannot ignore evidence in the record that is contrary to her argument.

Callaway also argues that

> whether Pigg even relied on this ground at trial is unclear. Question 6 asked whether Callaway failed to comply with the [Easement] Agreement but did not differentiate among alleged breaches. The focus at trial was on nonpayment, and Pigg sought and the jury awarded damages solely for unpaid maintenance and repair costs—not for non[]residential use. [Record reference omitted.]

The record is not unclear, and no matter what Pigg emphasized, the issue was before the jury. Pigg certainly relied on the misuse in her brief. She presented evidence of misuse, and the charge—when asking whether Callaway failed to comply with the Easement Agreement—instructed the jury that the Easement Agreement provided that "the easement shall be restricted to pedestrian and vehicular traffic for residential use." Thus, the issue was clearly before the jury. With respect to the argument that "the jury awarded damages solely for unpaid maintenance and repair costs—not for non[]residential use," Callaway ignores the damage question in the charge. Question 10 asked the jury to award money for "the damages, if any, that resulted from Callaway's failure to comply," and the jury awarded more than $11,000 in damages for property damage caused by Callaway's use after she breached the Easement Agreement.

51

Q. Are those dollar figures, that estimate to repair the asphalt, is that to repair the damage that you believe has been caused by these extra heavy vehicles?

A. Yes.

As we have noted and as Callaway again ignores, the jury found $11,000 in "[d]amage to the property caused by . . . Callaway[ and her family] after they breached the Easement Agreement."

And Pigg also juxtaposes the failure to make payments under the Easement Agreement with the improper use. The improper use lends an added impact to the failure to make payments. It gave the jury a view that Callaway wanted to use the benefits of the Easement Agreement while depriving Pigg of any benefit of the Easement Agreement. What the jury could have viewed as a hollow promise to perform also may have influenced the jury's determination regarding "the likelihood that the party failing to perform or to offer to perform will cure [her] failure, taking into account the circumstances including reasonable assurances"—a determination that one of the instructions to Question 6 required the jury to make.

Also, by simply ignoring Question 6's instructions and the evidence before the jury of Callaway's failures to comply with the Easement Agreement—failures that went beyond a failure to make payments—we agree with Pigg that Callaway has failed to attack all the bases that the jury had to conclude that Callaway's failure to comply with the Easement Agreement was material. As the Dallas Court of Appeals has previously explained, when multiple findings support a judgment, the failure to attack

52

one of the independent grounds supporting a jury's finding renders harmless any error

in the ground that was challenged:

> In general, an appellate court must affirm a trial court's judgment if an appellant does not challenge all independent bases or grounds that fully support the trial court's judgment. *See, e.g.*, *Bowman v. . . . Bank of N.Y. Mellon Tr*[.] *Co., N.A.*, No. 05-13-01684-CV, 2016 WL 258765, at *6 (Tex. App.—Dallas Jan. 21, 2016, pet. denied) (mem. op.); *LandAmer*[ic]*a Commonwealth Title Co. v. Wido*, No. 05-14-00036-CV, 2015 WL 6545685, at *9 (Tex. App.—Dallas Oct. 29, 2015, no pet.) (mem. op.[ on reh'g]); *Blackstone Med., Inc. v. Phoenix Surgicals*[,] *L.L.C.*, 470 S.W.3d 636, 648 (Tex. App.—Dallas 2015, no pet.); *Creech v. Columbia Med. Ctr. of Las Colinas Subsidiary*[,] *L.P.*, 411 S.W.3d 1, 6 (Tex. App.—Dallas 2013, no pet.); *Oliphant Fin. L.L.C. v. Angiano*, 295 S.W.3d 422, 423–24 (Tex. App.—Dallas 2009, no pet.). When independent jury findings fully support a judgment, an appellant must attack each independent jury finding to obtain reversal. *See LandAmer*[ic]*a*, 2015 WL 6545685, at *9. If an independent ground fully supports the complained-of judgment, but the appellant assigns no error to that independent ground, an appellate court must accept the validity of that unchallenged independent ground, and any errors in the grounds challenged on appeal are harmless because the unchallenged independent ground fully supports the complained-of judgment. *See* [*id.*]; *Blackstone*, 470 S.W.3d at 648; *Oliphant*, 295 S.W.3d at 423–24; *Prater v. State Farm Lloyds*, 217 S.W.3d 739, 740–41 (Tex. App.—Dallas 2007, no pet.).
>
> The harmless[-]error rule states, in part, that before reversing a judgment because of an error of law, an appellate court must find that the error amounted to such a denial of the appellant's rights as was reasonably calculated to cause and probably did cause "the rendition of an improper judgment." *See* Tex. R. App. P. 44.1(a)(1); *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) . . . ; *Blackstone*, 470 S.W.3d at 648–49. The harmless[-]error rule applies to all errors. *See Magee*, 347 S.W.3d at 297 (citing *Lorusso v. Members Mut. Ins. Co.*, 603 S.W.2d 818, 819–20 (Tex. 1980)); *LandAmer*[ic]*a*, 2015 WL 6545685, at *9; *Blackstone*, 470 S.W.3d at 649.

*Creditplex Auto Sales L.L.C. v. Bishop*, No. 05-15-00395-CV, 2018 WL 4090528, at *2

(Tex. App.—Dallas Aug. 28, 2018, pet. denied) (mem. op. on reh'g). By ignoring the

53

evidence of the easement's misuse, Callaway has failed to attack all the grounds that support the jury's answer to Question 6.[19]

[19]In her reply brief, Callaway raises a new argument that forfeiture was not a remedy under the terms of the Easement Agreement in the context of nonpayment of the amounts due under it. Arguments raised for the first time in a reply brief are waived. *See Bookout v. Shelley*, No. 02-22-00055-CV, 2022 WL 17173526, at *12 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.) ("[I]t is well[-]settled that courts cannot consider arguments raised for the first time in a reply brief."); *Lorant v. 2016 Parkview Condos. Dev. LLC*, No. 02-22-00032-CV, 2022 WL 16845110, at *4 n.11 (Tex. App.—Fort Worth Nov. 10, 2022, no pet.) (mem. op.) ("Arguments may not be raised for the first time in a reply brief." (quoting *Molho v. Weichert, Realtors Reichardt & Assocs.*, No. 14-11-00861-CV, 2012 WL 6631732, at *3 n.6 (Tex. App.—Houston [14th Dist.] Dec. 20, 2012, pet. denied) (mem. op.))).

Also, as we read the argument, it is again predicated on the argument that the failure to make payments did not prompt a forfeiture under the terms of the Easement Agreement and that Callaway made a tender of performance. We have addressed the tender argument and have discussed how the jury had evidence before it of another material breach. And the argument does not address the submitted jury issue, which determined that Callaway's failure to comply was material—as Pigg has argued—that a total failure to comply excluded Pigg's performance, the theory under which this case was tried.

Further, Callaway cites authority from this court that cites dicta for the proposition that misuse of an easement is not a basis to forfeit the easement. To trace the history of the citation, in 1941, the Waco Court of Appeals cited Corpus Juris Secundum in dicta for the proposition that misuse of an easement would entitle a party "not to a cancellation of the easement clause[] but only to have any improper or unauthorized use enjoined." *Seastrunk v. Walker*, 156 S.W.2d 996, 998 (Tex. App.—Waco 1941, writ ref'd w.o.m.). We have cited this dicta and in turn cited our case citing the dicta of *Seastrunk*. *See Hoak v. Ferguson*, 255 S.W.2d 258, 261 (Tex. App.—Fort Worth 1953, writ ref'd n.r.e.); *see also Smith v. Huston*, 251 S.W.3d 808, 828 (Tex. App.—Fort Worth, 2008, pet. denied). However, turning to our own citation to a legal encyclopedia, the rule is not as categorical as we have previously stated it to be:

> Use of an easement for an unauthorized purpose, or the excessive use or misuse of it, is not sufficient to cause a forfeiture of the easement unless the misuse of the easement is willful and substantial and not merely

We also address Callaway's subarguments. First, Callaway quotes a portion of Pigg's counsel's closing argument in which she said that the damages at issue were not a "ton of dollars." Callaway contends that by this argument, Pigg so minimized the harm that she had suffered from Callaway's failure to perform that it is an admission of "the *absence* of significant harm or deprivation suffered by Pigg" and "aligns with Callaway's position that any breach was minor, not material, and capable of remedy without forfeiture or termination of the Easement Agreement." This assertion ignores Pigg's counsel's prior argument that "[s]o of course the payment was a material, important condition." And it fails to contextualize Pigg's counsel's argument that drew the jury's attention to the importance of the rights involved:

> This one is not about a ton of dollars. It's more about the concepts. It's more about . . . Pigg's right to say[,] "That land was mine. I pay taxes on it. I maintain it. I gave you an [E]asement [A]greement for a little while, and then you let it lapse. It terminated. That land is now mine, and I want it to be mine. I don't need you on it anymore. You don't need it. I want it to be mine."

We do not view Pigg's counsel's challenged argument—in the context of the remainder of the argument—as making the concession that Callaway seeks to draw from it.

---

> minor or technical. However, extinguishing an easement is appropriate when the additional burden imposed on the servient estate is so violative of the terms of the express easement that continued use of the easement is precluded as a matter of law.

25 Am. Jur. 2d *Easements and Licenses* § 86 (May 2025 Update) (footnotes omitted). We reference this citation to show only that our past categorical statements may have been unwise. But we save resolution of that question for another day. We express no opinion on Callaway's waived argument.

Callaway's next ancillary argument is that the jury's answer—that Callaway's failure to comply is material—is contradictory to the jury's answer to Question 3—that the Easement Agreement had not terminated because of Callaway's predecessors-in-interest's failure to make the specified annual payments. We agree with the argument that Pigg makes in response:

> Question 3 asked the jury whether the Easement Agreement "*terminate*[*d*] because of the . . . predecessors[-]in[-]interest's failure to make the specified annual payments." Setting aside whether Question 3 was a proper question for the jury, the jury's interpretation of the Easement Agreement and resulting answer that the Easement Agreement did not "terminate" for lack of payment is not the same as a finding that Callaway "did not breach" by failing to pay. [Record reference and footnote omitted.]

*See Duke Energy Field Servs.*, 2004 WL 22474423, at *4 (noting that the easement agreement did not terminate for failure to make payment because the breach was not material). And we also note that Pigg testified that she did not expect payment under the Easement Agreement when no one else was using it. As Pigg testified,

> Q. So after you sent the letter to Mr. Hoppenrath, this lawsuit was the first time that -- that anyone brought up payment in 30 years for use of that easement, isn't it?
>
> A. No one had used it.
>
> Q. Now, there will be test --
>
> A. We didn't expect -- we didn't expect to be paid when no one used our driveway.

Thus, the jury could have viewed the Easement Agreement as being suspended when no one was using the Lane while still viewing the failure to perform once Callaway

56

claimed the right to exercise rights under the Easement Agreement as a material

failure to comply with its terms.

### 4. We overrule Callaway's argument that the evidence supporting the jury's answer to Question 6 is factually insufficient.[20]

The extent of Callaway's factual-sufficiency argument is as follows: "Alternatively, for the same reasons, the evidence is factually insufficient, and the judgment should be reversed and the case remanded for a new trial." Because the factual-sufficiency standard requires that we look to the entirety of the record, we add Callaway's claim that she made a "tender" into the evidentiary mix. As we have explained, the evidence of whether a tender occurred was disputed, thus presenting a fact question for the jury to resolve. Callaway's profession that she had made a

---

[20]We apply the following standard and scope of review to this question:

> If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. In reviewing an insufficiency[-]of[-]the[-]evidence challenge, the court of appeals must first consider, weigh, and examine all of the evidence that supports and that is contrary to the jury's determination. A court must sustain an insufficient[-]evidence point when the "evidence adduced to support the vital fact, even if it is the *only* evidence adduced on an issue, is factually too weak alone to support it." The court sets aside the judgment if the evidence is so weak "as to be clearly wrong and unjust."

W. Wendell Hall & Ryan G. Anderson, *Standards of Review in Texas*, 50 St. Mary's L.J. 1099, 1134–35 (2019) (footnotes omitted).

"tender" presented a credibility question to the jury, and it is not within our purview to second-guess the jury's determination on a credibility question.

We overrule Callaway's fourth issue.

**D.    We overrule Callaway's fifth issue challenging the jury's answer to (1) Question 7 on whether Pigg waived her claim that Callaway had failed to comply with the Easement Agreement and (2) Question 8 that Pigg is estopped to assert to a claim that Callaway breached the Easement Agreement "based on nonpayment."**

**1.    We overrule Callaway's challenge that the jury's answer to the waiver question is against the great weight and preponderance of the evidence.**

In the first subpart of her fifth issue, Callaway argues that the jury's negative answer to the question of whether Pigg had waived her claim that Callaway had failed to materially comply with the Easement Agreement is against the great weight and preponderance of the evidence, i.e., a factual-sufficiency challenge.[21] The state of the record is such that whether a waiver occurred was a matter solely within the province of the jury.

The jury answered "no" to the following question:

---

[21]Waiver and estoppel are affirmative defenses for which Callaway bore the burden of proof. *See* Tex. R. Civ. P. 94. We repeat that when a party attacks the factual sufficiency of an adverse finding on an issue on which she had the burden of proof, that party must show that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. To resolve this type of factual-sufficiency challenge, "[t]he court of appeals must consider and weigh all of the evidence[] and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

Did Pigg waive her claim regarding Callaway's failure, if any, to materially comply with the Easement Agreement?

> Failure to comply by Callaway is excused if compliance is waived by Pigg. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

The question instructs the jury in accordance with the usual definition of waiver as "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 334 (Tex. 2020). To amplify, "[w]aiver is a question of intent, examining whether a party's conduct, in light of the surrounding facts and circumstances, is 'unequivocally inconsistent with claiming' that right." *Id.* at 334–35. "There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003). Waiver is usually a question of fact. *Id.*

Callaway summarizes her challenge to the evidentiary sufficiency of the jury's answer to the waiver question as follows:

> The evidence of Pigg's actions and inactions over the years demonstrates an intentional relinquishment of her right to enforce the Easement Agreement. And Pigg's refusal to accept payments tendered by Callaway and her lack of formal requests for payment over two decades is overwhelming evidence of a waiver of her right to claim a breach.

59

Examining the underpinnings of this argument does not reveal such an imbalance in the evidence that makes the jury's negative answer to the waiver question against the great weight and preponderance of the evidence. In summary,

- On the question of whether Pigg's failure to make a demand for payment is overwhelming evidence of a waiver, we have already noted that Pigg testified that she did not pursue payment because Callaway's predecessors in interest were not using the Lane. Further, as Pigg points out, Callaway's argument relies on evidence that the jury was not instructed to consider in Question 7. The waiver question that the jury answered was directed to Callaway's failure and not that of her predecessors in interest. The jury was instructed that "[f]ailure to comply *by Callaway* is excused if compliance is waived by Pigg." [Emphasis added.] Next, it is disputed that Pigg allowed Callaway's use of the Lane without protest; when Callaway began using the easement in a way that Pigg viewed as contrary to its terms, Pigg (or Robin) protested. For instance, Pigg testified as follows:

  > Q. And people used the road, [the] Lane, to get from Briar Road to 7760, which is Lot 32, right?
  >
  > A. They did, but they were requested not to for the year of -- of 2019.

  By the same token, Robin's conversation with Callaway also indicated that there was a dispute about Callaway's use of the Lane. Robin testified,

  > The only conversation I had with [Callaway] after that was after I -- she had come out and mowed our property. So I went to [Pigg] and I said -- you know, we told them not to traverse the property and -- until we could figure this all out. Please . . . don't mow my grass, please. Just come out the concrete and go down the asphalt for the time being.

  This mix of evidence reveals that the question of Pigg's intent to waive rights under the Easement Agreement was within the province of the jury to resolve.

60

- With respect to Pigg's alleged refusal to accept a "tender," we have detailed why the record does not support Callaway's contention that the evidence of a tender was undisputed.

In her reply brief, Callaway tries to sidestep the dispute over Pigg's intention—evidenced by the bullet-pointed discussion—by again arguing that Pigg had refused her tender of performance—an issue that we have already addressed. Then Callaway argues three other aspects of Pigg's conduct. First, she argues that Pigg waived her right to claim that Callaway had failed to comply with the Easement Agreement by referencing Pigg's conduct before Callaway owned the property. Again, Question 7 did not ask the jury about Pigg's conduct relative to the predecessors in interest.

Second, Callaway argues that Pigg's claim—that the easement was not being used—is not persuasive because "her only support is that she didn't see it being used. Lack of observation simply isn't proof of nonuse." [Record references omitted.] In other words, Callaway argues that Pigg's claim—that she did not assert her right because she did not believe the easement was being used—is not credible. This argument presents a credibility question that was for the jury to resolve.

Third, Callaway argues that Pigg must have waived her right to enforce the Easement Agreement because mere nonuse does not legally constitute abandonment of an easement. *See Johnson v. Town of Fulton*, No. 13-23-00436-CV, 2024 WL 2198665, at *6 (Tex. App.—Corpus Christi–Edinburg May 16, 2024, no pet.) (mem. op.); *Perry v. City of Gainesville*, 267 S.W.2d 270, 274 (Tex. App.—Fort Worth 1954, writ ref'd

61

n.r.e.). In other words, the jury could not believe Pigg's expression of her intent of why she took no further action to enforce the easement because her belief was not based on the proper legal standard. Pigg expressed her view that the easement was not being utilized based on the view that she formed as a layman. The jury was not instructed on the standard of abandonment that Callaway references, and there is no indication that Pigg had any knowledge of this standard. Here, we cannot see how the jury erred by accepting Pigg's testimony based on the standard that Callaway advocates for when neither Pigg nor the jury had any knowledge of that standard.

We overrule the first subpart of Callaway's fifth issue.

### 2. We overrule Callaway's challenge that the jury's answer to the estoppel question is against the great weight and preponderance of the evidence.

In the second subpart of her fifth issue, Callaway argues that the jury's negative answer to Question 8 asking whether Pigg is estopped from claiming that Callaway breached the Easement Agreement is against the great weight and preponderance of the evidence. Again, Callaway's factual-sufficiency challenge is ill-founded.

Question 8 of the charge presented the estoppel issue as follows:

Is Pigg estopped from claiming [that] Callaway materially breached the Easement Agreement based on nonpayment?

> Estoppel prevents a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. It applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.

62

Callaway's brief states that she is relying on the quasi-estoppel doctrine. The nature of the quasi-estoppel doctrine was recently described by the First Court of Appeals in a fashion that parallels jury Question 8:

> "Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." [Citations omitted.] Quasi-estoppel, or estoppel by contract, "is not actually one of estoppel, as estoppel in pais; it is just another way of stating that a party is bound by the terms of his contract unless it is void, annulled, or set aside in some way." *Sparkman*[ *v. Cunningham*, No. 11-10-00304-CV], 2012 WL 3264483[,] at *2 [(Tex. App.—Eastland Aug. 9, 2012, no pet.) (mem. op.)] (citing *Stevens v. State Farm Fire & Cas. Co.*, 929 S.W.2d 665, 672 (Tex. App.—Texarkana 1996, writ denied)). Put another way, quasi-estoppel "forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Brooks v. Brooks*, 257 S.W.3d 418, 423 (Tex. App.—Fort Worth 2008, pet. denied) (citations omitted); *see also Richardson v. Allstate Tex. Lloyd's*, 235 S.W.3d 863, 865 (Tex. App.—Dallas 2007, no pet.) [(op. on reh'g)] ("Under Texas law, the affirmative defense of estoppel applies in a breach-of-contract claim when a party accepts a benefit voluntarily *and* with knowledge of all material facts.") . . . . But there "can be no ratification or estoppel from acceptance of the benefits by a person who did not have knowledge of all material facts." *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex. App.—Fort Worth 2010, no pet.) (citing *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971)).

*Tony's Concrete Work, LLC v. Goad*, No. 01-23-00759-CV, 2024 WL 3528443, at *8 (Tex. App.—Houston [1st Dist.] July 25, 2024, pet. denied) (mem. op.).

Callaway's cursory attack on the jury's finding is embodied in a single paragraph:

> The jury's "No" answer to Question 8 on whether Pigg is estopped from claiming that Callaway materially breached the Easement Agreement

63

because of nonpayment is against the great weight and preponderance of the evidence. Pigg's actions over twenty years misalign with her belated enforcement of the payment terms in the Easement Agreement. Pigg's sudden and belated claim that Callaway breached the Easement Agreement by not paying the $100 annual fee when she had not sought enforcement after two decades of inaction and acquiescence contradicts the fundamental principles of fair dealing and equity encapsulated by the doctrine of estoppel. [Record references omitted.]

As Pigg notes, she testified that she did not try to collect money under the Easement Agreement because the Lane was not being used. Thus, this testimony allowed the jury to find that she did not represent to anyone or acquiesce to a position that the easement could be used without payment of the required fee. Nor would a finding that Pigg was estopped to claim a failure to make payments—even if found to exist—prevent Pigg from claiming that misuse of the easement was a material violation of the Easement Agreement's terms.

Nor does Callaway's argument align with the theory that she invokes. Callaway does not argue that she was led to believe that she could use the easement without payment. In fact, her arguments are based on the claim that once she knew performance was required, she tried to perform under the Easement Agreement, but Pigg spurned her efforts to perform. Callaway cites no evidence of anything that Pigg said or did to produce a belief on Callaway's part that Pigg would acquiesce in a position that the easement could be used no matter whether there was performance of the Easement Agreement's terms or not. Finally, Callaway does not tell us what

benefit Pigg accepted that makes it unfair for her to now claim that performance is required under the Easement Agreement.

The arguments raised in Callaway's reply brief are equally unavailing. Without citation to the record, Callaway argues that she relied on Pigg's conduct. If so, she never testified that she did.

Next, Callaway argues that Pigg's belief that the easement had lapsed strengthens an argument that an estoppel exists because "[h]er own mistaken belief [that the easement had been abandoned] does not justify her attempt to revive the allegedly abandoned [Easement] Agreement selectively or inconsistently." How this shows that Pigg took the contradictory position to support an estoppel—presumably, the position that a party could use the easement without performance—is unexplained. Finally, Callaway argues that "[i]f Pigg knew . . . Callaway[ and her family] were using the easement for more than strict residential access and did nothing for years, she cannot now claim breach." This ignores that the jury found that Pigg became aware of Callaway's failure to comply with the Easement Agreement in 2019 and that she sued in 2021. Also, how Pigg ignored long-standing misuse is once again unexplained. Further, Pigg testified that the initial grantees of Lot 32 were made aware that their access was through their grantor's property and were made aware that the Lane could not be used without permission. And again, Pigg testified that the same request was made in 2019. Robin testified that she had confronted people who had used the Lane and who did not belong and that she had asked Callaway to restrict

her use in certain regards "until we could figure this all out." Thus, the record contains testimony contrary to Callaway's argument that Pigg is estopped because she sat silent about use of the easement.

We overrule Callaway's fifth issue.

**E.** **We overrule Callaway's sixth issue challenging the trial court's award of Pigg's attorney's fees through trial but remand to determine if a recalculation of fees is necessary in light of our holdings above.**

In her sixth issue, Callaway makes a two-pronged attack on the trial court's award of attorney's fees. First, she argues that the trial court abused its discretion by awarding fees because that award was not equitable and just. Second, she argues that Pigg's proof of fees was lacking because there is no evidence that the fees were reasonable and necessary and that the fee-segregation evidence is factually insufficient. We hold that the trial court did not abuse its discretion by awarding attorney's fees. We also conclude that Callaway's claim that there is no evidence that the fees were reasonable and necessary ignores the proof that Pigg offered. We do, however, remand on the issue of segregation because we have held that one of the trial court's declarations was in error. As Pigg's fee proof hinged on her success in obtaining the various declarations in the amended final judgment, we remand so that the trial court may determine whether the error in one of those declarations requires a recalculation of fees.

1. **The issue of fees was submitted to the trial court for resolution, and we set forth how the trial court resolved the issue.**

The parties agreed that attorney's fees would be dealt with in a separate bench trial. The trial court confirmed that the fee issue could be a "ruling on papers." After trial, Pigg filed a motion for judgment that included a declaration by her counsel and sought a combined total of approximately $126,000 in attorney's fees, broken down by the claims on which the trial court determined that Pigg had prevailed. Callaway filed a response that lodged a number of objections to Pigg's fee request. Callaway's counsel later filed an affidavit itemizing why he had concluded that Pigg's counsel's declaration failed to establish that her fees were reasonable and necessary. The trial court signed an initial judgment that awarded Pigg attorney's fees. Callaway challenged that award in her amended motion for new trial, which was heard by submission. The trial court then signed an amended judgment that decreed that "[Pigg] shall have and recover against [Callaway] the sum of $93,750.00 for attorney's fees through judgment." No request for findings of fact and conclusions of law was made.

2. **We set forth Callaway's attack that the trial court's award of fees was not equitable and just.**

As we read Callaway's brief, she argues initially that the trial court abused its discretion by making any award of fees under the Uniform Declaratory Judgments Act (UDJA). We will address Callaway's serial attacks in turn, each of which we

conclude is lacking. We address these arguments even though we are remanding the

fee question in case Callaway urges these arguments on remand.

### 3. We set forth the standard of review for an award of attorney's fees under the UDJA.

The UDJA provides that "[i]n any proceeding under this chapter, the court may

award costs and reasonable and necessary attorney's fees as are equitable and just."

Tex. Civ. Prac. & Rem. Code Ann. § 37.009. When we address Callaway's challenge

to Pigg's proof of fees, we will discuss the standards governing that proof, but initially

we set out the overarching standards that govern the trial court's decision to award

fees under the UDJA:

> In "any proceeding" under the UDJA, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009. The UDJA "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). In a declaratory[-]judgment case, we review a trial court's award of attorney's fees for an abuse of discretion. *Id.* It is an abuse of discretion for a trial court to rule arbitrarily, unreasonably, or without regard to guiding legal principles. *Id.*
>
> To determine whether evidence is sufficient to support the trial court's exercise of discretion, we consider (1) whether the trial court had sufficient information upon which to exercise its discretion, to which we apply the legal[-] and factual[-]sufficiency standards of review, and (2) whether the trial court erred in its application of that discretion, i.e., whether, based on the evidence before it, the trial court made a reasonable decision. *Jones-Hospod v. Maples*, No. 03-20-00407-CV, 2021 WL 3883884, at *6 (Tex. App.—Austin Aug. 31, 2021, pet. denied) (mem. op.). A trial court does not abuse its discretion when its ruling is based on conflicting evidence and some evidence of substantive and

68

probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009). Because the trial court did not issue findings of fact or conclusions of law, we imply all facts supported by the evidence that are necessary to support the trial court's ruling. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

*Comm'rs Ct. of Wise Cnty. v. Mastropiero*, No. 02-22-00383-CV, 2023 WL 3017941, at *4 (Tex. App.—Fort Worth Apr. 20, 2023, no pet.) (mem. op.).

### 4. We overrule Callaway's serial attack on the trial court's exercise of its discretion to award attorney's fees under the UDJA.

In her first challenge to the trial court's exercise of its discretion, Callaway persists in her argument that because Pigg's counsel argued that the case was "not about a ton of dollars" and only requested $100 annually if the easement were found valid, the trial court's award of over $90,000 in fees was disproportionate. We have already rejected Callaway's premise that Pigg's counsel's argument supports the implication that Callaway draws from it. Both Pigg's counsel's argument and the conduct of the parties shows far more at stake in this case than an annual recovery of $100.

The argument also ignores the proof offered by Pigg of the fees that she had incurred in the litigation. Nor is the argument consistent with the fact that Callaway's counsel opined that her reasonable and necessary fees in this matter were $120,000—a claim strikingly at odds with the contention that the case was of trivial consequence. An argument that picks one strand out of the haystack and turns a blind eye to the panoply of facts before the trial court does not demonstrate an abuse of discretion.

69

Next, after Callaway filed an eighty-six-page appellant's brief, a forty-seven-page reply brief, and a seventy-page cross-appellee's brief, she argues that "the trial court's award is not supported by sufficient evidence that the fees were reasonable and necessary given the *simplicity* of the issues, the *straightforward application* of legal principles, and the minimal damages awarded." [Emphasis added.] Further, the clerk's record in this matter consumes three volumes and 1,200 pages, there are five volumes of the reporter's record, and the jury charge submitted fourteen questions. We conclude that Callaway's characterization of this matter in terms of simplicity and straightforwardness is unconvincing.

In an argument that is a shade and phase of the prior argument—that it is inequitable and unjust to award more than $90,000 in fees in such a trivial case—Callaway next argues that "[t]he judgment did not award Pigg actual damages. Therefore, the attorney's fees exceeded the actual damages awarded—$0—by $93,750. Texas courts have consistently held that fee awards grossly disproportionate to the relief obtained may be deemed inequitable and unjust." We will simply say again that this argument ignores the breadth of the issues before the trial court.

The argument also ignores precedent that an attack based on a disproportionate award of fees without an attack on the underlying proof of fees is ineffective. As the Fourteenth Court has previously held,

> [Appellant] does not challenge the base lodestar calculation of
> $12,464.00. [Appellant] argues that the trial court abused its discretion
> by failing to reduce the lodestar due to the disproportion between the

70

damages award of $520.00 and the fee award of over $12,000.00. Our sister courts, however, have held consistently that disproportion between the amount recovered and the amount of attorney's fees will not, on its own, justify reduction of the lodestar. *See Young v. Sanchez*, [No.] 04-10-00845-CV, 2011 WL 4828021, at *6 (Tex. App.—San Antonio Oct. 12, 2011, no pet.) (mem. op.) ("A disproportionate relationship between the amount of damages and attorney's fees awarded does not alone render the attorney's fee award excessive, and [appellants] cite no other factor to show the fee award was unreasonable."); *Flatrolled Steel, Inc. v. Jones*, [No.] 05-04-01175-CV, 2005 WL 1405742, at *2 (Tex. App.—Dallas June 16, 2005, no pet.) (mem. op.) ("Although appellee was awarded $13,405.89 in actual damages and $38,716.28 in attorneys' fees, disproportion alone does not render the award of attorneys' fees excessive."); *Gorman v. Countrywood Prop. Owners Ass*['*n*], 1 S.W.3d 915, 919 (Tex. App.—Beaumont 1999, pet. denied) (mere fact that attorney's fee award was multiple of actual damages did not render fee award excessive). As [appellant] points us to no other evidence supporting a reduction of the lodestar, we cannot conclude that the trial court abused its discretion by failing to adjust the lodestar calculation. *See Rohrmoos Venture*[ *v. UTSW DVA Healthcare, LLP*], 578 S.W.3d [469,] 501 [(Tex. 2019)].

*Johari v. Ayva Ctr. LLC*, No. 14-17-00912-CV, 2020 WL 897385, at *2 (Tex. App.—Houston [14th Dist.] Feb. 25, 2020, no pet.) (mem. op.) (footnotes omitted). Thus, we reject an argument based exclusively on disproportionality.

Next, Callaway argues that the trial court failed to consider "equity and justice" because she "made efforts to cure her obligations, tendered payments, and showed a willingness to perform in the future, all of which mitigate against a punitive fee award." This is a rehash of Callaway's prior allegedly undisputed tender argument that we have rejected. Callaway fails to explain how the trial court acted "punitively" by awarding fees that it believed were proven for Pigg's attorneys' work on this case or which were similar to the fees charged by Callaway's attorney.

Callaway's final argument—that the fee award is not equitable and just—stems from the fact that Pigg initially pleaded this case as one to quiet title and for trespass for which fees are not recoverable under the UDJA and later amended her petition to bring claims under that Act. Callaway argues,

> By seeking fees for work performed during the initial eight months of litigation—when her claims were limited to trespass and quiet title—Pigg improperly attempts to recover fees for non[]recoverable claims. Pigg's retroactive attempt to justify attorney's fees undermines her fee request and highlights the inequity of the trial court's award. [Footnote omitted.]

But as Callaway acknowledges, Pigg's counsel provided a chart that allocated her fees between fees for which claims were recoverable and which were not. Work done before declaratory relief was sought could well have advanced those claims. Indeed, some of the work was interviewing the client and deed research. Thus, we reject the premise that any work done before a declaration was sought *ipso facto* cannot be recovered for prosecuting a UDJA claim.[22]

---

[22]In an argument relegated to a footnote, Callaway argues that Pigg could not recover fees under the UDJA because she was asserting what were actually claims to quiet her title. The supreme court has left open the question of whether a quiet-title action is available to resolve a dispute involving an easement. *See Lance v. Robinson*, 543 S.W.3d 723, 739 (Tex. 2018). But opinions from our sister courts permit the use of the UDJA to determine the validity of an easement:

> It is settled law that the UDJA may be used to determine the validity of an easement. *See, e.g.*, *Shelton v. Kalbow*, 489 S.W.3d 32, 56–57 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (holding it was proper for trial court to render declaratory judgment that deed granted easement for public use of road); [*City of Garden Ridge v.*] *Ray*, [No. 03-06-00197-CV,] 2007 WL 486395, at *3 [(Tex. App.—Austin Feb. 15, 2007, no pet.) (mem. op.)] ("While we agree that the UDJA may be used to determine

the validity of an easement, . . . [t]here is no dispute that the easement in this case is valid.”); *Roberson v. City of Austin*, 157 S.W.3d 130, 136 (Tex. App.—Austin 2005, pet. denied) (“[W]e note that a large number of easement cases have been decided under the UDJA.” (citing Tex. Civ. Prac. & Rem. Code [Ann.] §§ 37.002(b), 37.004)). [Appellant] signed the Easement Agreement and now disputes its validity. Accordingly, [appellee] was entitled to seek a declaration regarding whether it has an easement on the Property. *See Shelton*, 489 S.W.3d at 56–57.

*Hous. Cmty. Coll. Sys. v. HV BTW, LP*, 589 S.W.3d 204, 218 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see also Edry-TX-II, GP v. CCND-Main ST Shopping Ctr., LP*, 683 S.W.3d 450, 457–58 (Tex. App.—Houston [14th Dist.] 2023, pet. denied) (holding—in a suit in which the party “labeled its claim for declaratory judgment as a separate count from its suit to quiet title”—that a declaratory-judgment action was appropriate and explaining that the party “established a prima facie case for its declaratory[-]judgment action because [it] showed that it had a real dispute with [the opposing party] concerning its easement interest, and that the dispute would be resolved with a declaration”).

Beyond these holdings, Callaway also disregards that she filed her own declaratory-judgment counterclaim:

[Callaway] request[s] a declaration from the [c]ourt regarding the parties’ rights and obligations regarding the use of [the] Lane. In this regard, [Callaway] request[s] that the [c]ourt grant declaratory judgment that [the] Lane is a dedicated access easement to [Lot 32]. In the alternative, [Callaway] request[s] that the court declare that [she] ha[s] the right to use [the] Lane pursuant to an express[,] written easement agreement.

Pigg’s answer sought “recovery of her attorney’s fees in defending against . . . Callaway’s claims, pursuant to CPRC § 37.001, et. seq.” Thus, Callaway ignores that she postured Pigg’s ability to recover fees under the UDJA. *See Hartford Cas. Ins. Co. v. Budget Rent-A-Car Sys., Inc.*, 796 S.W.2d 763, 771 (Tex. App.—Dallas 1990, writ denied) (“Thus, where a claimant or a counter-claimant has properly invoked the declaratory[-]judgment statute, either party may plead for and obtain attorney’s fees. The award of attorney’s fees is not limited to the plaintiff or to the party affirmatively seeking declaratory relief.” (citations omitted)); *see also Savannah Ct. P’ship v. Strait*, No. 02-23-00200-CV, 2024 WL 482227, at *8, *9 n.22 (Tex. App.—Fort Worth Feb. 8, 2024, no pet.) (mem. op.) (“[E]ven if a trial court lacks subject[-]matter jurisdiction to

73

We also note that the trial court did not award all the fees that Pigg sought. Callaway did not request findings of fact and conclusions of law, so we do not know the basis for this action. The trial court may well have reduced the fee award to address the very concern that Callaway raises.

### 5. We set forth Callaway's attack on Pigg's proof of attorney's fees.

Pigg's proof of fees included a declaration from her attorney and attached exhibits (collectively, the Declaration). The body of the Declaration is eight pages long. Twenty-eight pages of fee invoices are attached, as is a six-page chart that apportions time entries between easement-cancellation issues and issues other than easement cancellation. In Callaway's second argument under the fee challenge that she raises in her sixth issue, she asserts a no-evidence challenge that attacks the fee proof on two grounds. First, Callaway claims that (1) the statements in the Declaration do "not adequately address why the attorney's fees, including the hourly rates, are reasonable in the context of the local market"; and (2) "the declaration does not justify the relevance of the time recorded to the case's specific issues." Second, Callaway argues that the proof of how the fees were segregated is so insufficiently detailed that it is "speculative, conclusory, and no evidence." We overrule the no-evidence challenges. As noted, we remand rather than reach the challenge on the segregation proof to permit the trial court to decide whether to recalculate its fee award.

adjudicate the merits of a declaratory[-]judgment claim, it may still award attorney's fees related to that claim.").

74

**6.** **We overrule Callaway's first challenge in the second portion of the argument under her sixth issue that the Declaration contains no evidence of the reasonableness of Pigg's attorney's fees in the context of the local market or the relevance of the work performed.**

A fee claim under the UDJA is governed by the Texas Supreme Court's guiding authority that requires initial proof of a lodestar. The Austin Court of Appeals has summarized the guiding authority from the Texas Supreme Court as follows:

> Proof of fee awards under the [UDJA] is governed by the principles laid out in *Rohrmoos Venture . . . . See* 578 S.W.3d [at] 494–503 . . . ; *Green v. Villas on Town Lake Owners Ass'n, Inc.*, No. 03-20-00375-CV, 2021 WL 4927414, at *5–6 (Tex. App.—Austin Oct. 22, 2021, pet. denied) (mem. op.). To meet *Rohrmoos Venture*'s standards, a fee claimant must at least put on evidence of the "lodestar method" for calculating fee awards. 578 S.W.3d at 501. "Under the lodestar method, the determination of what constitutes a reasonable attorney's fee involves two steps." *Id.* (quoting *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012)). "First, the [factfinder] must determine the reasonable hours spent by counsel in the case and a reasonable hourly rate for such work." *Id.* (quoting *El Apple I*, 370 S.W.3d at 760). "The [factfinder] then multiplies the number of such hours by the applicable rate, the product of which is the base fee or lodestar." *Id.* (quoting *El Apple I*, 370 S.W.3d at 760). "The [factfinder] may then adjust the base lodestar up or down (apply a multiplier), if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case." *Id.* (quoting *El Apple I*, 370 S.W.3d at 760). "[A] claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought." *Id.* at 501–02. "Sufficient evidence includes, *at a minimum*, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* at 502 (emphasis added).

*Faith P. & Charles L. Bybee Found. v. Knutzen*, 681 S.W.3d 818, 839–40 (Tex. App.—Austin 2023, no pet.).

75

Callaway attacks the Declaration because it allegedly does not speak to the reasonableness of fees "in the context of the local market"; her attack focuses on one paragraph of the Declaration but ignores another provision dealing with the same topic. The challenge is fatally incomplete and unconvincing nonetheless.

Callaway references only a single paragraph of the Declaration stating that

[d]ue to my experience in litigation in Tarrant County and my review of other firms' invoices as part of litigating other matters, I am aware that my hourly rate for an attorney of my experience and credentials is extremely reasonable. Similarly, the hourly rates I am charging [for] those assisting me in handling this case are also extremely reasonable.

But Callaway ignores a more detailed provision that appears earlier in the Declaration:

I am counsel for [Pigg] in the above-captioned case. I am licensed to practice law in the State of Texas and have continuously practiced law since 1991, during which time I have specialized in litigating business, contract, and real[-]estate disputes from initial investigation and filing through trial and appeal, which I have done throughout Texas and especially Tarrant County during my 30-plus years of practice. I have served on the State Bar's Oil and Gas Pattern Jury Charge committee since its inception, including positions as Chair, Vice Chair, and chair of the "Injury to Real Property" subcommittee. I have also served as the Chair of the Tarrant County Bar Association Business Litigation [Section] and as Chair of its Energy Section. I am board-certified by the Texas Board of Legal Specialization in Civil Trial Law and in Oil, Gas[,] and Mineral Law. As a result of this experience, I am familiar with the reasonable and necessary work required by attorneys at various experience levels in lawsuits such as this. I am also familiar with the customary and reasonable attorney's fees charged in Tarrant County for cases of this type (both from my own experience and from reviewing attorney[-]fee evidence from opposing lawyers). In addition, I am intimately familiar with the work that has been done in this case.

Again, Callaway makes no attack on this provision and cites no case supporting her attack overall.

76

Looking to what the Declaration provides, we conclude that it is some evidence of the reasonableness of fees in the local market. The Amarillo Court of Appeals recently dealt with the following testimony to support an award of fees:

> [Appellee] was represented at trial by two attorneys who work at the same firm. One attorney testified that he has been in practice in the Lubbock area since 1999 and is familiar with contractor claims such as those at issue in this case. He testified that he is familiar with typical attorney's billing practices in such cases and that he was "very much on par with other attorneys of our experience" in charging $300 per hour. He testified that the $300 hourly rate is customary and reasonable for such cases in Lubbock County. The records admitted into evidence reflect that both attorneys charged the rate of $300 per hour. He did not provide testimony specifically related to the other attorney's experience. There were no other timekeepers reflected on the bills.

*Webb v. Dynamic JMC Builders, LLC*, No. 07-22-00247-CV, 2023 WL 4220812, at *4 (Tex. App.—Amarillo June 27, 2023, no pet.) (mem. op.). The proof of fees also included records reflecting the work performed. *Id.* The Amarillo court concluded that the evidence was legally and factually sufficient. *Id.*

The unchallenged paragraph in the Declaration of Pigg's counsel has a higher level of detail than the example we cite from the Amarillo court. We conclude that the Declaration provided some evidence of a reasonable and customary fee in Tarrant County.

Adopting the same approach as her prior argument, Callaway next argues that "the [D]eclaration does not justify the relevance of the time recorded to the case's specific issues." This challenge again references one paragraph of the Declaration:

77

As to the totality of services reflected on the attached records, it is my opinion that each of the services and the time expended on those services was reasonable and necessary, and it is further my opinion that the corresponding charge for each of those services and time is reasonable.

But again, Callaway ignores a later provision of the Declaration, which states that

[i]n my professional opinion, each of these amounts is reasonable considering the time and labor required, the novelty and difficulty of the questions involved, the skill and knowledge required to perform the legal services properly, the likelihood that acceptance of this particular employment and its time requirements would (and did) preclude me from accepting employment on other matters, the fees customarily charged in Tarrant County for similar services, the amount of money/importance of the rights involved and the anticipated results obtained, the time limitations imposed by the client or by the circumstances, the nature and length of the professional relationship with the client, the experience, reputation and abilities of the lawyers performing the services in question, [and] whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Again, Callaway ignores the actual substance of the Declaration.

As with her prior argument, Callaway's argument fails. Callaway argues that the Declaration "only provides the time sheets and the putative allocation but does not explain *why* the work was relevant and needed and *why* the time was reasonable." The only citation that Callaway offers to support her argument is to the portion of *Rohrmoos* stating how the lodestar is calculated. *See* 578 S.W.3d at 501–02. This standard requires proof that the work was "relevant," and Callaway's argument appears to actually be an attack directed to whether there is proof of segregation.

This leaves the question of whether the Declaration contains proof on the issue of "*why* the time is reasonable." Again, the trial court had the Declaration and the fee statements before it to calculate the lodestar. Looking again to an example of what another of our sister courts has determined to be sufficient, the Eastland Court of Appeals recently dealt with fee proof that took the following form:

> Appellee's request for attorney's fees, upon which the trial court relied when it rendered its attorney's fee award, was supported by [appellee's counsel's] affidavit, along with an attached itemized billing statement. In his affidavit, [appellee's counsel] stated that he provided legal services on this case from March 2022 through May 2022, and that the attached account document shows the legal services that he rendered. [Appellee's counsel] further averred that the requested attorney's fees for legal services are reasonable based on multiple factors, including (1) the novelty and difficulty of the issue involved, the skill required to provide the legal services properly, and the experience, reputation, and expertise of the lawyer performing the services; (2) the time and labor involved to perform the legal services properly; and (3) the fee customarily charged in the community for similar services.
>
> The attached billing statement also includes itemized entries for legal services provided by [appellee's counsel]. Each entry discusses the particular legal services performed, the attorney who performed the services, the amount of time required to perform the services, the hourly rate of the attorney who performed the services, and the total billable hours for each task—as required by *Rohrmoos*—for a total of $3,000 in attorney's fees for legal services rendered, which spanned the period from January 20, 2022, through May 11, 2022.

*CST Permian, Inc. v. SW Fluids, LLC*, No. 11-23-00036-CV, 2024 WL 2061215, at *10 (Tex. App.—Eastland May 9, 2024, no pet.) (mem. op.). At least, with respect to the amount of fees covered by the billing statements in the Eastland case, the affidavit provided sufficient proof of those fees referenced in the billing statements. *Id.* at *11.

Here, the Declaration and attached fee statements provide the same level of detail that the Eastland court concluded was adequate.

We overrule Callaway's no-evidence challenges in her argument under her sixth issue.

**7.    We address Callaway's second challenge in the second portion of the argument under her sixth issue that Pigg failed to properly segregate her fee claim.**

Callaway next argues that Pigg has failed to properly segregate her fee claim and that, for this reason, the evidence is conclusory or factually insufficient to support the trial court's fee award. Pigg calculated her fee claims by segregating between those declaratory-judgment claims upon which she prevailed and those on which she did not. We have held that one of the declarations made by the trial court was in error. To address whether this result might impact the trial court's determination of what fees should be awarded, we remand to the trial court the question of the amount of the fee award through trial. *See Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 455 (Tex. 2015) (op. on reh'g) (noting that reversal of declaratory judgment does not require reversal of fee award but nonetheless reversing fee award due to changed outcome on primary issues); *Savannah Ct. P'ship*, 2024 WL 482227, at *9 & n.22 (remanding fee claim because "given the altered status of the parties as to their success on the merits—the merits of the nonjusticiable declaratory[-]judgment claims, that is—the equities underlying the trial court's determination of attorney's fees have changed"); *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304,

80

324 (Tex. App.—Dallas 2004, no pet.) (recognizing that "after a declaratory judgment is reversed on appeal, an award of attorneys' fees may no longer be equitable and just").

We overrule the challenges made in Callaway's sixth issue, with the exception of remanding the fee-segregation question to the trial court.

### F. We overrule Callaway's seventh issue arguing that the trial court's judgment improperly includes the Estate of Edgar "Pat" Pagett Callaway.

In her seventh issue, Callaway claims that the trial court erred by including the Estate of Edgar "Pat" Pagett Callaway in its judgment because the record demonstrates that the sole grantee of the "property in question" was the Edgar Pagett Callaway Revocable Living Trust. This argument is predicated on the fact that the Estate was not owner of the "property in question" because a deed in the record shows that it was conveyed to the referenced trust and because "[t]here is no evidence the Estate ever held title, exercised control, or assumed any contractual duties under the Easement Agreement." Neither Callaway's action nor the deed she relies on support her contention.

Callaway bases her argument—that the Estate has no interest—on a deed by which she apparently claims that Lot 32 was conveyed to the Trust. The argument cites an exhibit by which Callaway claims it "is undisputed that title to Lot 32 was conveyed to the Revocable Trust, not to Edgar Callaway individually or to his Estate." But the cited deed contains a different property description than the deed by which Lot 32 was conveyed to Pat Callaway. The deed that Callaway cites as conveying Lot

81

32 to the Trust conveys a tract described as "Block: Lot 3 of the Maroon Myrtle Subdivision to the City of Fort Worth, Tarrant County more commonly known as 107-A and 107-B Roberts Cut Off, Fort Worth, Texas 76114." We are left in the dark to understand Callaway's claim when the deed she relies on to support her argument conveys a different property other than Lot 32.

Also, the Estate was made a party to the UDJA claims by both Pigg *and* Callaway. The argument that the Estate is not a proper party does not explain why she pleaded her own declaratory claims asserting that the claims were brought in her capacity as Executor of the Estate of Edgar "Pat" Pagett Callaway. Specifically, in Callaway's UDJA counterclaim and claim for breach of the Easement Agreement, her pleading recites that the parties include: "Defendant Stormie Callaway, Executor of the Estate of Edgar 'Pat' Pagett Callaway has previously appeared and answered in this case." The counterclaim then pleads,

> [*Callaway*] request[s] a declaration from the [c]ourt regarding the parties' rights and obligations regarding the use of [the] Lane. In this regard, [Callaway] request[s] that the [c]ourt grant declaratory judgment that [the] Lane is a dedicated access easement to [Lot 32]. In the alternative, [Callaway] request[s] that the court declare that [Callaway has] the right to use [the] Lane pursuant to an express, written easement agreement. [Emphasis added.]

Thus, it is contradictory for Callaway on the one hand to assert claims in a capacity on behalf of Pat Callaway's Estate and then to claim that the Estate has no interest that justifies including it in the trial court's judgment.

Finally, the charge defined "Callaway" as "Stormie Callaway, Trustee of the Edgar Pagett Callaway Revocable Living Trust, and Stormie Callaway, Executor of the Estate of Edgar 'Pat' Pagett Callaway." No objection was made to that definition.

Thus, the argument that the Estate of Edgar "Pat" Pagett Callaway had no interest in Lot 32 is not supported by the evidence that Callaway cites nor her actions when she made claims on behalf of the Estate, and she failed to object to the charge's definition that included the Estate.

We overrule Callaway's seventh issue.

## IV. Conclusion

Having overruled Callaway's first, fourth, fifth, sixth, and seventh issues, but having sustained her second and third issues, we remand this case to the trial court to determine the question of segregation of attorney's fees through trial and to recalculate fees should it find that necessary to do. Enough of the declarations decreed in the trial court's amended judgment remain to grant Pigg the relief that the Lane was not dedicated to public use and that she is excused from further performance of the Easement Agreement. Thus, we need not address the issues raised by Pigg in her appeal. *See* Tex. R. App. P. 47.1. We affirm the amended final judgment except to remand the question of the segregation of attorney's fees through trial.

/s/ Dabney Bassel
Dabney Bassel
Justice

Delivered: July 10, 2025

83